Cynthia N. VAN ZANDT, Appellee,

v.

HOLY REDEEMER HOSPITAL and Manuel A. Bergnes, M.D.

Appeal of: Holy Redeemer Hospital.

Cynthia N. Van Zandt, Appellee,

v.

Holy Redeemer Hospital and Manuel A. Bergnes, M.D.

Appeal of: Manuel A. Bergnes, M.D.

Superior Court of Pennsylvania.

Argued June 25, 2002.
Filed Aug. 5, 2002.
Reargument Denied Oct. 7, 2002.

John J. Hare, Doylestown, for Holy Redeemer Hospital.

Robert Toland, II, Wayne, for Bergnes.

Martin A. Durkin, Philadelphia, for Van Zandt.

BEFORE: LALLY–GREEN, OLSZEWSKI, and POPOVICH, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 In this consolidated appeal, Appellants Holy Redeemer Hospital (Hospital) and Dr. Manuel A. Bergnes, M.D. (Dr. Bergnes) appeal from the judgment entered on June 4, 2001, in favor of plaintiff/Appellee, Cynthia N. Van Zandt. We vacate the judgment and remand for entry of judgment notwithstanding the verdict (jnov).

¶ 2 The unusual factual and procedural history of the case is as follows. In January 1999, Van Zandt filed a complaint against the Hospital and Dr. Bergnes. Van Zandt alleged the following. Her mother, Susan Van Zandt (the decedent), died while in the Hospital's care on June 18, 1997. The Hospital knew or should have known that the decedent and her family did not want the decedent's organs to be donated. Dr. Bergnes, an agent of the Hospital, conducted an autopsy of the decedent's body on June 19, 1997. Dr. Bergnes' autopsy report indicated that the decedent's eyes had been donated.[1] After Van Zandt read the autopsy report, she suffered emotional distress.

¶ 3 Van Zandt raised three causes of action against the Hospital: (1) negligence; (2) negligent infliction of emotional distress; and (3) respondeat superior; *i.e.*, vicarious liability for the actions of Dr. Bergnes. Van Zandt alleged that the Hos-

---

1. The "External Examination" section of the autopsy report begins, "The body is that of an adult white woman measuring 66 inches in length and weighing approximately 160 pounds. The hair is black. The eyes have been donated. The body is garbed in a hospital gown...." Autopsy Report, 6/19/97, at 2.

pital either harvested[2] the decedent's eyes or allowed another person or entity to do so, all without express consent. Van Zandt also alleged that the Hospital was negligent for failing to safeguard the decedent's body, and for issuing an autopsy report which "it knew or should have know[n] was inaccurate and/or otherwise contained false information."[3] Complaint at ¶ 15(f).

¶ 4 Van Zandt raised causes of action against Dr. Bergnes for negligence and negligent infliction of emotional distress, alleging precisely the same underlying factual allegations. It should be noted that the only damages identified in the complaint were damages for emotional distress. Van Zandt also sought punitive damages against both Appellants.

¶ 5 On March 9, 1999, in response to preliminary objections by the Hospital, Judge Arnold New dismissed with prejudice Count II (negligent infliction of emotional distress), Count III (respondent superior), and all claims for punitive damages against the Hospital. Similarly, on May 19, 2000, in response to preliminary objections by Dr. Bergnes, Judge New dismissed with prejudice Count II (negligent infliction of emotional distress) and all claims for punitive damages against Dr. Bergnes.

¶ 6 On October 3, 2000, Van Zandt filed a motion to amend the complaint in response to deposition testimony given by Dr. Bergnes on August 17, 2000. According to Van Zandt, Dr. Bergnes testified that on July 1, 1998, he received a telephone call from the Hospital's Chief Pathologist, Peter J. Farano, M.D. Motion to Amend at ¶ 9. Dr. Bergnes memorial-

ized this conversation in a handwritten note stating that it was possible that the eyes were not removed, and that it was possible. Dr. Bergnes did not remove the bandages over the decedent's eyes to establish that they were actually harvested. *Id.* According to Dr. Bergnes' handwritten note, he had no specific recollection of whether he removed the bandages. *Id.*, Exhibit D. On the same day, legal counsel for the Hospital dictated an amended postmortem report stating: "the original description of the external examination indicated that the eyes had been donated. In actuality, both eyes were covered with bandages. These bandages were never removed, and the eyelids were never retracted to corroborate the absence of the eyes." *Id.* at ¶ 10. Dr. Bergnes signed this amended report. *Id.*, Exhibit E. Van Zandt alleged that these newly-discovered facts constituted conspiracy, conversion, and egregious conduct forming a basis for punitive damages. On November 8, 2000, the trial court denied Van Zandt's motion to amend.

¶ 7 Trial took place before Judge Alfred DiBona, Jr., on January 4–5, 2001. Van Zandt began her case by playing the videotaped deposition testimony of Dr. Bergnes. Dr. Bergnes, age 85 at the time of the deposition, testified in relevant part as follows:

> I never actually saw the eyes on the corpse. I observed the bandages covering the eyes. I saw a note reading "do not remove". On the basis of those observations that the eyes had been donated, I assumed that the eyes had been donated. I assumed that the eyes had been donated.

**2.** The parties use the word "harvested" to refer to the removal of the eyes for purposes of organ donation.

**3.** The nature of this allegedly "false information" is unclear. As noted further *infra,* Van Zandt argued that the decedent's eyes actually

were harvested for donation. Thus, when the autopsy report indicated that the eyes were donated, under Van Zandt's theory of the case it would appear that this information was accurate.

The truth is I do not know if my assumption was correct or not. Without lifting the eyelids, it is impossible to know if any part of the eyes has been donated, and I never, ever—I never even removed the bandages covering the eyes. It was a false assumption on my part that produced that remark.

N.T., 8/17/2000, at 66. He could have investigated the meaning of the "do not disturb" sign, but did not do so. *Id.* at 112. He agreed that it was beyond the standard of medical care to make assumptions when conducting an autopsy. *Id.* at 67.

¶ 8 On July 1, 1998, almost one year after the decedent died, Dr. Farano contacted him and asked him about amending the report, which he agreed to do. *Id.* at 69. He told Dr. Farano that he had not lifted the decedent's eyelids. *Id.* at 72. Dr. Farano sent him a draft amended report, which he signed. *Id.* at 69. Dr. Bergnes did not write the amended report, but he approved it and signed it. *Id.* at 73. At first he stated that it was his understanding that legal counsel for the Hospital drafted the words of the amended report. *Id.* Later, he acknowledged that he did not know who wrote the amended report. *Id.* at 177. When asked if he knew that making a mistake on an autopsy report could cause great pain to the family members of a deceased, Dr. Bergnes replied:

Yes. You are asking me—I heard about this a year later, you know? I remembered then when I was asked what the sequence of events were, and I apologize to Mrs. Van Zandt's daughter profoundly, and I can understand her concern, but, as I have stated, I was in error in the statement and the reasons for it. More I cannot tell you.

*Id.* at 105.

¶ 9 The purpose of the autopsy was to determine the cause of death, and the condition of the decedent's eyes was not relevant to that determination. *Id.* at 136–137. Dr. Bergnes did not remove the decedent's eyes, and has never removed anyone's eyes in the past. *Id.* at 139–140. As of the date of the deposition, he does not know whether the eyes were donated. *Id.* at 154.

¶ 10 Van Zandt's testimony may be summarized as follows. On June 17, 1997, the decedent was admitted to the Hospital suffering from seizures, a brain injury, and a tumor in her abdomen. On the next day, Van Zandt and her family decided to remove the decedent from life support. By 6:30 in the evening, Van Zandt paid her last respects to her mother. At that time, the decedent's eyes were open and unbandaged. *Id.* at 90. Nurses from the Hospital asked her to leave the room so they could prepare the decedent for the morgue. *Id.* When she returned to the room approximately 20 minutes later, the respirator had been removed and two bandages were taped to the decedent's eyes. *Id.* at 93. There were no notes or papers attached to the bandages. *Id.* at 94. At approximately 10:00 that night, she received a call from the Lions Eye Bank of Delaware Valley asking if she would be interested in donating her mother's eyes to the eye bank. She refused, and had no further contact with the eye bank after that phone call. *Id.* at 96–97. She denied the eye bank's request because the decedent was opposed to organ donation for religious reasons. *Id.* at 98. Despite this professed concern that the body remain intact after death, the body was cremated at the request of Van Zandt and her family. *Id.* at 100. She last saw the decedent's body at a funeral home two days after the death. The decedent's eyes were closed and her face had a sunken look. Van Zandt could not determine whether the eyes were present. *Id.* at 100.

¶ 11 In the late summer or early fall of 1997, Van Zandt requested her mother's autopsy report because Van Zandt's oncologist felt it would be helpful in monitoring Van Zandt's ovarian cancer. When Van Zandt read that her mother's eyes had been donated, Van Zandt suffered great emotional distress. *Id.* at 103. She testified that she "backtracked" in her grieving process and that she suffered from nightmares. She saw a psychologist throughout 1998.

¶ 12 Van Zandt also presented the testimony of Paul J. Hoyer, M.D., a forensic pathologist. Dr. Hoyer provided his expert opinion that Dr. Bergnes did not meet a reasonable standard of care in performing the first autopsy report "in that he described examining eyes or the absence of eyes when he—depending on what you believe to be the case, he either had not looked or didn't remember looking." N.T., 1/4/2001, at 59. In other words, he deviated from the standard of care when he described something which he did not necessarily see. *Id.* at 69.

¶ 13 Finally, Van Zandt presented stipulated testimony from an employee of the Lions Eye Bank. The stipulation stated that between 9:45 and 10:25 p.m. on June 18, 1997, the employee telephoned Van Zandt and sought permission for the eye donation, and that Van Zandt refused permission. *Id.* at 127.

¶ 14 The trial court denied the defendants' motion for a directed verdict. The defendants then presented their evidence. The Hospital presented testimony from the president of the Lions Eye Bank, stating that he undertook a comprehensive review of the eye bank's records and determined that the decedent's eyes had not been donated there. N.T., 1/5/2001, at 144–146.

¶ 15 Bernadette Kenny, a registered nurse at the Hospital, testified that shortly after the decedent's death, she filled out an organ donation consent form indicating that Van Zandt denied consent for organ donation. *Id.* at 166. While she had no recollection of the instant case, it is the practice of the Hospital to send the body directly to the morgue after the family has paid its last respects. The morgue is locked at night. *Id.* at 168. Ms. Kenny did not see a large bandage over the decedent's eyes with a handwritten sign saying "do not disturb". The body was in the I.C.U. from 7:05 p.m. until 9:30 p.m., whereupon it was sent to the morgue. *Id.* at 177.

¶ 16 The defendants presented the videotaped deposition testimony of Dr. Farano, who at the time was chairman of the Department of Pathology and Laboratory Medicine. He testified that Dr. Bergnes was not a permanent member of the Hospital's staff; rather, he would be called in to serve on a temporary, "as-needed" basis. N.T., 1/4/2001, at 10. He first heard of Van Zandt's concerns through speaking with Peg Harkins, the Hospital's risk manager. *Id.* at 6. On July 1, 1998, Dr. Farano spoke to Dr. Bergnes, who admitted that he had never removed the bandages from the decedent's eyes to see whether the eyes had been donated. *Id.* at 8–9. Dr. Farano stated that he, not legal counsel for the Hospital, drafted the amended report for Dr. Bergnes to sign. *Id.*

¶ 17 Dr. Farano was then confronted with the discrepancy between the amended report, which stated with certainty that the eyes had not been examined, and Dr. Bergnes' handwritten memorandum of his conversation with Dr. Farano, which stated a "possibility" that Dr. Bergnes did not look at the eyes. Dr. Farano did not recall whether Dr. Bergnes couched the issue in terms of a "possibility". *Id.* at 29. Dr. Farano did state that "I would not have

chosen those words [in the amended report] unless it was clear to me or with a high degree of likelihood that he had indicated that they were covered." *Id.* at 30–31. Dr. Farano stated that Dr. Bergnes was free to change the wording of the amended report if he desired. *Id.* at 36. After the defense rested, the defendants moved for a directed verdict, which was denied.

¶ 18 In closing argument, Van Zandt's counsel presented his theory of the case. Counsel argued that: (1) the decedent's eyes had in fact been harvested by an unknown person, most likely when the body lay in the I.C.U. on June 18, 1997 in the hours after 7:05 p.m.; (2) Dr. Bergnes' initial report stating that the eyes had been donated was accurate; (3) Dr. Bergnes removed the bandages and confirmed the absence of the eyes, because it was his practice to do so; (4) someone probably disposed of the eyes after learning that Van Zandt had not given consent; (5) the amended report and Dr. Bergnes' testimony about a "do not disturb" sign on the eyes were part of an attempt by the defendants to cover up the fact that the eyes were removed without consent; · and (6) the amended report was dictated by legal counsel for the hospital rather than by Dr. Farano. *Id.* at 209–229.

¶ 19 The court instructed the jury that Dr. Bergnes was not an agent or employee of the Hospital, but rather was an independent contractor. The jury found that Dr. Bergnes and the Hospital were both negligent, and that each party's negligence was a substantial factor in causing harm to Van Zandt. The jury found the Hospital 75% liable and Dr. Bergnes 25% liable. The jury awarded a general verdict of $300,000.00. Both defendants filed post-trial motions, which were denied on May 8, 2001. On June 4, 2001, the court entered judgment in favor of Van Zandt, and imposed $23,798.39 in delay damages. These consolidated appeals followed.

¶ 20 Dr. Bergnes raises four issues on appeal:

A. Did the lower court err and commit an abuse of discretion in failing to enter a judgment n.o.v. in Dr. Bergnes' favor, or to award him a new trial, since the verdict rendered was unsupported by the requisite evidence and the law?

B. Did the lower court err and commit an abuse of discretion in refusing to award Dr. Bergnes a new trial since the jury heard, on two separate occasions, inappropriate references to the topic of insurance?

C. Did the lower court err and commit an abuse of discretion in refusing to award Dr. Bergnes a new trial based on the contents of plaintiff's counsel's summation which included erroneous, unsubstantiated and prejudicial remarks that the decedent's eyes were "thrown out"?

D. Did the lower court err in refusing to grant Dr. Bergnes a new trial or remittitur based on the unsupported and excessive verdict?

Dr. Bergnes' Brief at 4.

¶ 21 First, Dr. Bergnes argues that he is entitled to judgment notwithstanding the verdict because Van Zandt failed to establish the essential elements of a negligence claim. We agree. Our standard of review is as follows:

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to

decide if there was sufficient competent evidence to sustain the verdict.... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case.

*Parker v. Howard S. Freilich,* 803 A.2d 738, 744 (Pa.Super.2002) (citation omitted). "The jury may not be permitted to reach its verdict merely on the basis of speculation and conjecture, but there must be evidence upon which logically its conclusion may be based." *Rohm & Haas Co. v. Continental Cas. Co.,* 732 A.2d 1236, 1254 (Pa.Super.1999), *affirmed,* 566 Pa. 464, 781 A.2d 1172 (2001), *citing, Smith v. Bell Tel. Co.,* 397 Pa. 134, 153 A.2d 477, 480 (1959). "Therefore, when a party who has the burden of proof relies upon circumstantial evidence and inferences reasonably deducible therefrom, such evidence, in order to prevail, must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith." *Smith,* 153 A.2d at 480.

¶ 22 "To establish a cause of action in negligence, the plaintiff must demonstrate that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Martin v. Evans,* 551 Pa. 496, 711 A.2d 458, 461 (1998). Where the plaintiff fails to carry her burden of proof, judgment in the defendant's favor is the appropriate remedy. *Buckley v. Exo-dus Transit & Storage Corp.,* 744 A.2d 298, 309 (Pa.Super.1999).

¶ 23 In the instant case, Van Zandt abandoned any claim that Dr. Bergnes' initial report was erroneous.[4] Rather, she strenuously argued to the jury that the eyes had indeed been removed. On the other hand, Van Zandt presented no evidence that Dr. Bergnes was the person who removed the eyes, or that Dr. Bergnes had any duty to prevent any such removal from taking place. It is undisputed that Dr. Bergnes was called to the Hospital on an "as needed" basis to conduct autopsies, and that he did so in the instant case. More importantly, Van Zandt made no claim that Dr. Bergnes was in any was responsible for the initial eye removal. Even reading the record in the light most favorable to Van Zandt, she failed to carry her burden of proof with respect to the central element of her case.

¶ 24 Next, we turn to the possibility that the jury held Dr. Bergnes responsible for signing a false amended report as part of a "coverup" of the truth that the eyes had been removed. This claim fails because Van Zandt presented insufficient competent evidence to support the underlying premise that the eyes were removed by anyone. Our reasoning follows.

¶ 25 It is undisputed that the decedent died with her eyes open and that bandages were placed on her eyes before sending her body to the Hospital morgue. Van Zandt presented no evidence that anyone actually removed the decedent's eyes during the hours that the body was in the I.C.U. Similarly, she presented no evidence that anyone removed the decedent's

**4.** If Van Zandt had pursued the considerably less dramatic theory that the eyes were **not** removed, and that the initial report was erroneous, then we would address an entirely different set of legal issues such as the liabili-ty, if any, of a physician for negligently issuing an inaccurate report. *See generally, Armstrong v. Paoli Hospital,* 430 Pa.Super. 36, 633 A.2d 605 (1993).

eyes while it was en route to the morgue or while the body was inside the morgue itself. She presented no evidence that any eye bank received the eyes; no evidence demonstrating how this eye removal could have taken place; no evidence showing who could have or would have done such a thing; and no evidence from the funeral director concerning the state of the eyes. Thus, after reviewing the trial testimony in its entirety, it is apparent that the only basis for Van Zandt's claim that the eyes were donated was Dr. Bergnes' initial report to that effect.

¶ 26 Again, it is undisputed that the decedent's eyes were bandaged after her death and were bandaged during the autopsy. Interestingly, Dr. Bergnes' initial report does not state that he physically **removed** these bandages and **saw** that the eyes were removed. Rather, it states the **conclusion** that the eyes had been "donated." The report is consistent with a conclusion that Dr. Bergnes removed the bandages and saw no eyes. On the other hand, the report is also consistent with Dr. Bergnes' testimony that he did not remove

the bandages, and he erroneously assumed the eyes were removed.

¶ 27 We recognize that it is generally the province of the jury, not the trial court or this Court, to determine which of two inferences is more plausible. *Smith, supra.* We also recognize that Van Zandt did present a scintilla of evidence in favor of the proposition that the eyes were removed.[5] On the other hand, the trial court and this Court have a duty to ensure that a jury verdict is based on more than mere surmise or conjecture. *Id.* In the instant case, we are constrained to conclude that this is one (mercifully) rare case where the evidence did indeed amount to nothing more than impermissible conjecture. We hold that, based on the record before us, Van Zandt's evidence in its entirety could not have reasonably outweighed the contrary conclusion that the eyes were not removed. In short, the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for Dr. Bergnes. JNOV is the appropriate remedy.[6] As a result of our

---

5. For example, Dr. Bergnes testified that in all other autopsies he conducted where the eyes were bandaged, the eyes had been donated. N.T., 8/17/2000, at 177. This evidence does tend to suggest that the eyes were removed in this case as well. It is also consistent with Dr. Bergnes's testimony that he assumed the eyes were donated because they were bandaged.

6. We note a particularly insightful and revealing exchange at trial between Van Zandt and counsel for Dr. Bergnes:

> Van Zandt: I have no way of knowing what to believe, because the autopsy report said that the eyes had been donated when I told them not to take her eyes. I don't know who to believe, quite frankly. I wish I did. I wish I could—you know....
>
> . . .
>
> Q. Now, you say you have no way to believe that the eyes were in the body

because of the autopsy report, correct? But actually, you do, don't you?

A. What would that be?

Q. Well, Ms. Van Zandt, you know what it would be. It would be the amended autopsy report.

A. Oh, the one—oh, after my attorney's office contacted the hospital and the amended report came out over a year after my mother died saying the eyes weren't donated?

Q. Yes, that one, Ms. Van Zandt. But you choose not to believe that one, correct?

A. I choose not to believe it, no.

Q. And you choose not to accept Dr. Bergnes' apology for writing a report which has caused this lawsuit; is that correct?

A. Had the apology happened three years ago, if Dr. Bergnes had said I'm sorry, we goofed, the eyes weren't donated, then I would believe it, and I would go on living my life. But instead, over a year after my mother died, an amended

disposition, we need not address Dr. Bergnes' remaining claims.

¶ 28 We now turn to the Hospital's appeal. The Hospital raises four issues:

I. Whether judgment nov or a new trial is required because the jury's verdict was unsupported by adequate evidence or, at a minimum, contrary to the weight of the evidence?

   1. Whether plaintiff failed to adduce sufficient evidence to support her central claim that her mother's eyes were actually harvested?

   2. Whether plaintiff's theory of liability violates Pennsylvania law, which does not recognize a claim of negligence based upon an error in a medical report?

   3. Whether plaintiff failed to adduce sufficient evidence to establish any of the elements of her negligence claim?

II. Whether a new trial is required because plaintiff's counsel twice made clear and needless references to the fact that each defendant had liability insurance coverage in this case?

III. Whether a new trial is required because the trial court improperly allowed plaintiff to pursue claims for negligent infliction of emotional distress and conspiracy, where those claims had been dismissed by another trial judge prior to trial?

IV. Whether a new trial or substantial remittitur is required where the jury's verdict was manifestly excessive?

Hospital's Brief at 5.

¶ 29 The Hospital contends that jnov in its favor was appropriate because Van Zandt presented insufficient evidence that the decedent's eyes were removed by anyone. For the reasons set forth above, we agree. Accordingly, jnov in the Hospital's favor was appropriate as well. As a result of our disposition, we need not address the Hospital's remaining claims. The judgment of the trial court is vacated with instructions to enter jnov in favor of Dr. Bergnes and the Hospital.[7]

---

autopsy report came out, and I got a halfhearted apology last month that I don't even know what it was for. I'm still not sure.

Q. So the fact that Dr. Bergnes publicly, under oath in a public deposition, acknowledged that he never looked at the eyes and that he wrote "the eyes were donated" when he had no basis to write that and therefore should never have written that, that is not acceptable to you today; is that correct?

A. I didn't see that as a genuine apology for what happened. Like I said, if it had happened three years ago, it would be a different story.

N.T. 1/4/2001, at 122–123.

7. While we need not address any other issues raised by Dr. Bergnes or the Hospital, we do note our concern that Van Zandt was permitted to present emotional distress damages to the jury in apparent violation of the coordinate jurisdiction rule. "The coordinate jurisdiction rule stands for the proposition that judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions.... [It] is a rule of sound jurisprudence based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency." *Zane v. Friends Hosp.*, 770 A.2d 339, 340 (Pa.Super.2001), *appeal granted*, 566 Pa. 322, 781 A.2d 93 (2001). As noted above, before trial, Judge Arnold New dismissed all claims for negligent infliction of emotional distress. Van Zandt's action consisted entirely of emotional distress damages. Under the coordinate jurisdiction rule, Van Zandt should have been precluded from presenting emotional distress damages to the jury. The trial court indicated that emotional distress damages were appropriate under *Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970). Trial Court Opinion, 12/18/2001, at 4–5. That case

¶ 30 Judgment vacated. Remanded for entry of jnov. Jurisdiction relinquished.

held that a party who intentionally or wantonly mistreats or withholds the corpse of a deceased is liable for emotional distress suffered by the immediate family members of the deceased. *Id.* at 120. *Papieves* is inapposite because the instant case went to the jury solely on a charge of **negligence,** not intentional or wanton mistreatment. Even if *Papieves* did apply and the Judge New's initial ruling was erroneous, the trial court still failed to explain why the coordinate jurisdiction rule should not apply.