READING RADIO, INC., T/D/B/A
WAGO Radio

v.

**Molly S. FINK, Isaac A. Ulrich, David L. Kline, WEEU Broadcasting Company and Reading Eagle Company.**

**Appeal of: David L. Kline, WEEU Broadcasting Company and Reading Eagle Company.**

Superior Court of Pennsylvania.

Argued April 23, 2003.
Filed Sept. 19, 2003.

James H. Thomas, Lancaster, for appellants.

James E. Chiaruttini, York, for appellee.

BEFORE: HUDOCK, TODD and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellants David L. Kline, WEEU Broadcasting Co. (WEEU), and Reading Eagle Co. (Reading Eagle), appeal the judgment entered on July 31, 2002, in the Court of Common Pleas of Berks County. Upon review, we affirm.

¶ 2 The relevant facts and procedural history are as follows: Appellant Kline was the station manager/sales manager of Reading Radio, Inc., t/d/b/a/ WAGO Radio (WAGO). Part of Appellant Kline's responsibilities included the supervision of the station's sales representatives, including Molly S. Fink (Fink) and Isaac A. Ulrich (Ulrich). Fink and Ulrich were described as two of the best performing sales representatives in WAGO's employ. Both Fink and Ulrich were subject to a covenant-not-to-compete agreement with WAGO that provided "upon job termination, [they] would not seek or accept employment involving 'any radio or television broadcasting station located within a fifty (50) mile radius of Reading, Pennsylvania, for a period up to and including six (6) full calendar months' " commencing from the date of termination. However, Appellant Kline's employment contract was not subject to the covenant-not-to-compete.

¶ 3 From 1989 to 1991, WAGO's financial status faltered, and it was forced to move its operations out of Berks County as well as initiate other cost-saving measures. In mid–1990, Appellant Reading Eagle expressed an interest in purchasing WAGO and its FM affiliate, WIOV, from Reading Radio. The two companies held negotiations, but the sale never came to fruition.

¶ 4 In the midst of the sales negotiations, Appellant Reading Eagle offered Appellant Kline a position in its EagleLink division, which also included in its duties management of Appellant Reading Eagle's A.M. station, Appellant WEEU. Appellant Kline accepted the position and tendered his resignation as station manager of WAGO but agreed to remain in WAGO's employ for 30 days. Ostensibly, Appellant Kline made this agreement to effect a smooth transition. Appellant Kline made repeated assurances to his superiors at WAGO that he would continue to work as diligently for WAGO as he did in the past and that the station would be in better shape after he left it than it had been prior to his leaving.

¶ 5 During the 30–day period, Appellant Kline cancelled his bluegrass music program on WAGO without notice to his employers and transferred a significant car dealership advertising account to Appellant Reading Eagle. The transfer also included the use of a dealer vehicle that was for Appellant Kline's use as station manager at WAGO. Also within the 30–day period, Appellant Kline solicited Fink and Ulrich to work for Appellant WEEU

in identical sales positions that they held at WAGO in breach of the covenant-not-to-compete.

¶ 6 Fink and Ulrich tendered their resignations to Appellant Kline directly, who, although aware of the covenants-not-to-compete in Fink and Ulrich's employment contracts, did not attempt to enforce them. Appellant Kline refused to enforce the covenants-not-to-compete even after questioned about his failure to do so by Richard Nichols (Nichols), Appellant Kline's superior at WAGO. At approximately the same time as the loss of Fink and Ulrich, another top sales representative left WAGO on maternity leave. The loss of the majority of its sales staff caused WAGO to lose a number of advertising clients and advertising promotions, and, thus, the sales revenue and performance of WAGO faltered significantly. Expert testimony indicated that WAGO diminished in value by approximately $1.6 million dollars.

¶ 7 WAGO initiated this cause of action against Appellant Kline, Fink and Ulrich on November 30, 1991, *via* a Praecipe for a Writ of Summons. Thereafter, on June 20, 1991, Appellant Kline, Fink and Ulrich filed a Praecipe for a Rule to file a Complaint. The trial court then issued a Rule requiring WAGO to file its Complaint within 20 days. WAGO complied with the Rule and filed a Complaint against Appellant Kline, Fink and Ulrich on July 10, 1991. WAGO's Complaint alleged the following acts on the part of Appellant Kline, Fink and Ulrich: civil conspiracy; breach of contract; breach of pre-resignation and post-resignation common law and fiduciary duties; tortious interference with WAGO's contractual and business relationships; misappropriation of trade secrets and confidential information; and unfair competition. The Complaint sought both compensatory and punitive damages against Appellant Kline, Fink and Ulrich.

¶ 8 The trial court permitted WAGO to add Appellant Reading Eagle and Appellant WEEU as additional defendants on December 6, 1991. Thereafter, on December 20, 1991, WAGO filed an Amended Complaint that added Appellant Reading Eagle and Appellant WEEU as defendants. Following preliminary objections, WAGO filed a Second Amended Complaint. Appellants, Fink and Ulrich again filed preliminary objections, which the trial court denied on May 12, 1992. Thereafter, on June 1, 1992, Appellants filed an Answer, New Matter and several Counterclaims. The Counterclaims alleged the following: WAGO interfered with Appellant Kline's right to employment; WAGO breached its employment contract with Appellant Kline; and WAGO competed unfairly with Appellant Reading Eagle.

¶ 9 The case proceeded through pre-trial depositions and discovery during 1992–1994. The docket showed no activity after December 1994 until June 24, 1996, when Appellants filed a Motion for Judgment of *Non–Pros* against WAGO. The trial court denied this motion on August 15, 1996. Appellants filed a second Motion for Judgment of *Non–Pros* on December 16, 1997. In response, WAGO filed a Motion to Compel Answers to Interrogatories. Thereafter, the trial court denied Appellants' Motion for Judgment of *Non–Pros* on January 22, 1998.

¶ 10 The docket was again silent until January 11, 2000, when the trial court issued notice to the parties that the case was placed on the trial court's termination list for docket inactivity. On March 3, 2000, the parties stipulated to a discovery schedule and agreed the case should remain open. Thereafter, on March 7, 2000, the trial court removed the case from the

termination list, and the case continued through discovery.

¶ 11 Prior to trial, on October 16, 2000, the parties stipulated to judgment against Fink and Ulrich in the amount of $1.00, and the claims against them were satisfied. A jury trial was held from July 23, 2001, through July 31, 2001. Appellants did not assert any of their Counterclaims at trial. At the conclusion of trial, the jury returned a verdict in favor of WAGO in the amount of $300,000 compensatory damages. Punitive damages were assessed against Appellant WEEU in the amount of $5,000 and against Appellant Reading Eagle in the amount of $800,000. The total verdict was $1,105,000.

¶ 12 Appellants filed timely post-trial motions on August 9, 2001, which the trial court denied on May 14, 2002. On June 4, 2002, Appellants filed a Notice of Appeal to this Court. The trial court did not order Appellants to file a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b), and it did not file a new opinion in this case.[1] Thereafter, on July 31, 2002, Appellants filed a Praecipe to Enter Judgment so that this appeal could move forward.[2]

¶ 13 Appellants raise the following questions for our review:

A. Whether the trial court [abused] its discretion in accepting a broker of media properties as an expert qualified to testify as an appraiser[?]

B. Whether the trial court erred as a matter of law and abused its discretion in denying Appellants' Motion *In Limine* to preclude [WAGO] from introducing the Blackburn report at trial and by allowing Richard Blackburn to testify as an expert witness to the report[?]

C. Whether the trial court erred in denying Appellants' Motions for Nonsuit, Directed Verdict or Entry of Judgment Notwithstanding the Verdict where [WAGO] failed to prove elements of causation and damages, rendering the jury verdict speculative[?]

D. Whether the trial court erred in not directing the verdict in Appellants' favor on [WAGO's] claim for punitive damages or remitting the award because as a matter of law, the evidence did not rise to the level of conduct which supports an award of punitive damages[?]

E. Whether the trial court erred in permitting testimony concerning the alleged worth, revenue and cash flow of Appellant [Reading Radio], where the testimony was inadmissible hearsay and highly prejudicial[?]

F. Whether the trial court erred in permitting testimony concerning statements allegedly made during settlement negotiations where the testimony was cumulative and inadmissible under Pa.R.E. 408[?]

G. Whether Appellants' two Motions for Judgment of *Non Pros* should have been granted because plaintiff failed to prosecute within a reasonable time[?]

Appellants' Brief, at 6–7.

■ ¶ 14 Appellants first allege that the trial court abused its discretion when it admitted the expert testimony and report of Richard Blackburn into evidence on the issue of damages. Appellants argue that Blackburn was not qualified as an expert with regard to the appraisal of radio stations.

---

**1.** The trial court authored a lengthy opinion in support of its May 14th Order.

**2.** *See* Pa.R.A.P. 905(a).

¶ 15 We note first that we review challenges to a trial court's qualification of an expert witness under an "abuse of discretion" standard. *See Miller v. Brass Rail Tavern,* 541 Pa. 474, 481, 664 A.2d 525, 528 (1995). The testimony of expert witnesses is governed by Pa.R.E. 702, which states:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of opinion or otherwise.

¶ 16 Our Supreme Court has set forth the following test for trial courts to apply when qualifying a witness as an expert:

> [t]he test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required [...]. It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience.

*See Miller,* at 481, 664 A.2d at 528.

¶ 17 Appellants argue that Richard Blackburn (Blackburn) should not have been qualified as an expert in the field of radio station appraisal because his field of expertise was radio station brokerage, and he was not a member of the American Society of Appraisers. We disagree. The testimony presented at trial indicates that Blackburn received an MBA from Georgia State University and was employed thereafter by two radio stations as a sales representative. N.T. Trial, 7/26/2001, at 554. Blackburn then began to work for Blackburn and Co., his father's radio and television brokerage company, first as an analyst and later as a full-time broker and appraiser. *Id.* at 554–555. Blackburn is currently the president of Blackburn and Co. *Id.* He explained that when attempting to determine the "fair market value" of a radio station for purposes of sale, his company analyzes the following: the radio market of a given area; the facilities of the radio station and its competition; the format and rating history of the station; and a financial analysis of the radio station's performance. *Id.* at 566–567. Blackburn performed this type of analysis on approximately 450–500 radio stations and has testified as an expert witness on the value of radio stations in the past. *Id.* at 558, 562. In addition, he testified that he has done appraisals for the purposes of establishing damages at trial. *Id.* at 584. Finally, Blackburn's testimony indicated that a diminution valuation is the same analysis essentially as a valuation for purpose of sale, but the diminution valuation requires that an appraiser value the same radio station at two points in time, *i.e.,* a "before and after" analysis. *Id.* at 596–597.

¶ 18 We are satisfied that the trial court did not err when it qualified Blackburn as an expert witness. Merely because Blackburn was not a member of the American Society of Appraisers does not render him unfit for qualification as an expert witness. Rather, the central question is whether Blackburn possessed a reasonable pretension to specialized knowledge on the subject of radio station appraisal. *Miller,* at

481, 664 A.2d at 528. Our review of the record indicates that Blackburn had specialized knowledge and experience on the subject of radio station appraisal and, thus, was able to testify as an expert witness regarding the diminution in value of WAGO.

¶ 19 Appellants also argue that Blackburn's friendship with Alan Brill (Brill), WAGO's owner, rendered him unfit for qualification as an expert witness. This argument is without merit. A witness' relationship with one of the parties at trial raises questions of credibility rather than expertise and, as such, is a matter of the weight afforded to an expert's testimony by the jury. *See Van Zandt v. Holy Redeemer Hosp.*, 806 A.2d 879, 885–886 (Pa.Super.2002) (matters of credibility and weight of evidence are for finder of fact) (citation omitted). The record indicates that Appellants cross-examined Blackburn extensively regarding his relationship with Brill, and, therefore, we can discern no error on the part of the trial court. N.T. Trial, 7/27/2001, at 610–615. Accordingly, Appellants' argument fails.

¶ 20 Next, Appellants contend that the trial court abused its discretion in denying Appellant's Motion *In Limine* to preclude WAGO from introducing the Blackburn report at trial and by allowing Blackburn to testify as an expert witness to the report. Appellants argue that Blackburn's testimony was inadmissible under the holding of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), and its Pennsylvania equivalent, *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977).

¶ 21 As we held recently in *Trach v. Fellin*, 817 A.2d 1102 (Pa.Super.2003), the *Frye* test sets forth an exclusionary rule of evidence that applies only when a party wishes to introduce *novel scientific evidence obtained from the conclusions*

*of an expert scientific witness. Trach*, 817 A.2d at 1108–1109 (emphasis added). Under *Frye*, a party wishing to introduce such evidence must demonstrate to the trial court that the relevant scientific community has reached *general acceptance* of the principles and methodology employed by the expert witness before the trial court will allow the expert witness to testify regarding his conclusions. *Id.*, 817 A.2d at 1108–1109, 1112 (emphasis added). However, the *conclusions* reached by the expert witness from generally accepted principles and methodologies need not also be generally accepted. *Id.*, 817 A.2d at 1112. Thus, a court's inquiry into whether a particular scientific process is "generally accepted" is an effort to ensure that the *result* of the scientific process, *i.e.,* the proffered evidence, stems from "scientific research which has been conducted in a fashion that is generally recognized as being sound, and is not the fanciful creations [sic] of a renegade researcher." *See id.*, 817 A.2d at 1111 (*quoting Blum v. Merrell Dow Pharms., Inc.*, 564 Pa. 3, 9–10, 764 A.2d 1, 5 (2000) (Cappy, C.J., dissenting)).

¶ 22 In the present case, *Frye* is inapplicable because Blackburn's testimony regarding WAGO's diminution of value is not, nor could it be considered, *novel scientific evidence. Trach*, 817 A.2d at 1108–1109 (emphasis added); *see also Haney v. Pagnanelli*, 2003 PA Super 261, at ¶ 15. Valuation is mathematical and, in that sense, scientific, yet the methodologies used by Blackburn in this case (market analysis and performance analysis) were not novel, and Appellants failed to produce evidence that they were novel. Therefore, Appellants' reliance on *Frye* and its progeny is erroneous.

¶ 23 Appellants also contend that Blackburn's testimony and report were irrelevant and, thus, inadmissible for the following reasons: (1) it established only that

WAGO's diminution in value resulted from the loss of its employees rather than the tortious conduct of Appellants; and (2) the report was based on a hypothetical joint sale of WAGO and WIOV.

■ ¶ 24 Appellants cite our holding in *Hennessy v. Santiago*, 708 A.2d 1269 (Pa.Super.1998), for the proposition that, because Appellant Kline, Fink and Ulrich were "at-will employees," Appellants cannot be liable for interference with their covenants-not-to-compete with WAGO, and, therefore, damages cannot be measured from the departure of Appellant Kline, Fink and Ulrich from WAGO. This argument misstates the law. In *Hennessy*, we held that an at-will employee may not sue a third-party for tortious interference with a presently-existing at-will employment contract. *Hennessy*, 708 A.2d at 1278. Interference with a covenant-not-to-compete, on the other hand, is actionable in tort, despite an employee's "at-will employment" status. *See, e.g., Judge Tech. Servs. v. Clancy*, 813 A.2d 879 (Pa.Super.2002) (new employer sued for tortious interference with covenants-not-to-compete). The addendum of March 3, 1999, to Blackburn's Report establishes a link between WAGO's significant losses of sales revenue and the time of departure of Appellant Kline, Fink and Ulrich from WAGO's employment. *See* Blackburn Letter, 3/3/1999.

¶ 25 Appellants argue that Blackburn's March 3rd letter was a result of WAGO's attempt to "fit" the fact of the departure of Appellant Kline, Fink and Ulrich to WAGO's losses in order to establish damages resulting from their departure. We disagree. The issue of whether the letter of March 3rd was used to "fit" the fact of the departure of Appellant Kline, Fink and Ulrich to WAGO's losses is a matter that reaches the credibility of the expert witness and, as such, is for the consideration

of the jury. *See Van Zandt*, 806 A.2d at 885–886.

¶ 26 Appellants also argue that Blackburn's report was irrelevant and inadmissible because Blackburn examined the sale value of both WAGO and WIOV as a "package" rather than WAGO alone. We disagree. A review of Blackburn's report indicates that he indeed provided a separate value for WAGO prior to the departure of Appellant Kline, Fink and Ulrich ($1.8–$2 million dollars) and provided an independent value for WAGO after their departure ($400,000). *See* Blackburn Report, 3/1/1999, at 3. As Appellee explains, because WIOV was WAGO's sister station in the same market, he was obligated to view it in conjunction with WAGO when attempting to establish a value for WAGO. Blackburn testified that the two stations would be viewed as a "combination" in the radio industry, and, as such, WAGO would have a higher market value because of the existence of WIOV. *See* N.T. Trial, 7/27/2001, at 598–600. In any event, it is clear that Blackburn's valuation methodology presented a separate value for WAGO, and, therefore, Appellants' claim fails.

■ ¶ 27 We turn to Appellants' third claim: Whether the trial court erred in denying Appellants' Motions for Nonsuit, Directed Verdict or Entry of Judgment N.O.V. Appellants contend that WAGO failed to prove the elements of causation and damages for the various causes of action asserted, and, as a result, the jury's verdict was speculative. Our standard of review for a Motion for Compulsory Nonsuit is as follows:

A motion for compulsory non-suit allows a defendant to test the sufficiency of a [plaintiff's] evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of

all reasonable inferences arising from the evidence. When so viewed, a nonsuit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury.

*Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649, 653 (1996) (citations omitted).

¶ 28 Our standard of review for both the denial of a Motion for Judgment N.O.V. and a denial of a Motion for Directed Verdict is as follows:

> In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

> There are two bases upon which a judgment N.O.V. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Lanning v. West,* 803 A.2d 753, 756 (Pa.Super.2002) (citations and quotation marks omitted).

¶ 29 Both standards require this Court to perform essentially the same function, *i.e.,* to test the sufficiency of WAGO's evidence. Accordingly, viewing the facts in a light most favorable to WAGO, the record demonstrates the following: Appellant Reading Eagle Co., contacted Appellant Kline, while he was still in the employ of WAGO, and offered him a position as station manager for WEEU. *See* N.T. Trial, 7/24/2001, at 191–192; 7/26/2001, at 493–494. Appellant Kline later tendered his resignation to WAGO, but he promised to remain 30 days to effect a transition. *Id.,* 7/24/2001, at 43–44, 46–48. During the 30-day period, Appellant Kline cancelled a bluegrass music program that he broadcast at WAGO without notice to his superiors and, consequently, suspended advertisements made during the program. *Id.* at 234, 238. While in the midst of the 30-day period, Appellant Kline told Fink that he was going to work for Appellant WEEU, told her that there would be sales positions available and formed an "understanding" with her that she could leave WAGO to work for a sales position at Appellant WEEU. *Id.* at 271. On Ulrich's behalf, Appellant Kline inquired as to whether there were other sales positions available at Appellant WEEU. *Id.,* 7/25/2001, at 286–288. Thereafter, Appellant Kline met with Ulrich and discussed what Ulrich's salary would be when employed by Appellant WEEU. *Id.* at 290–292. Appellant Kline, Fink and Ulrich began employment at WEEU on the same day. While employed at WEEU, Fink and Ulrich called on former WAGO accounts. N.T. Trial, 7/24/2001, at 257–262; 7/25/2001, at 299–302.

¶ 30 Appellant Kline was aware of Fink and Ulrich's covenants-not-to-compete and did not, as station manager of WAGO, seek to enforce them during the final days of his employment at WAGO. At trial, Appellant Kline acknowledged that he made the decision to hire Fink and Ulrich at Appellant WEEU when he began to work at the station and that he was acting on behalf of Appellants Reading Eagle and WEEU when he hired them. N.T. Trial, 7/25/2001, at 210–213. Thereafter, the loss of WAGO's sales staff resulted in the decline of sales and revenue of WAGO. *Id.*, 7/23/2001 at 63–68.

¶ 31 WAGO sued Appellants on the following theories: breach of fiduciary duty of loyalty; intentional interference with the covenants-not-to compete WAGO had with its employees; unfair competition; and civil conspiracy. The jury's verdict did not specify the liability of Appellants with particularity. Therefore, we presume that the jury found Appellants liable on all counts, and we will consider whether the evidence was sufficient to find causation on all counts.

■■■■ ¶ 32 To prevail on a claim of breach of fiduciary duty of loyalty, a plaintiff must demonstrate that his agent acted for a person or entity whose interests conflicted with the plaintiff. Restatement (Second) of Agency § 394 (1958). The jury found that Appellant Kline breached his fiduciary duty of loyalty to his principal, WAGO. We agree. The facts demonstrate that, while still employed by WAGO, Appellant Kline actively engaged in diverting Fink and Ulrich from WAGO to Appellant WEEU, and he refused to enforce the covenants-not-to-compete to which they were bound. Appellant Kline was also aware at this time of the loss of a third sales representative due to maternity leave. Appellant Kline's failure to protect the integrity of the covenants-not-to-com-

pete and the sales staff at WAGO were clear violations of his duty of loyalty, for which he was liable in damages. Therefore, we are satisfied that the trial court did not err when it refused to enter judgment in Appellants' favor with respect to this claim.

■■■■ ¶ 33 WAGO also claimed that Appellants interfered with its contractual relationships with Fink and Ulrich. The elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa.Super.1997).

■■■■ ¶ 34 In the present case, it is clear that both Fink and Ulrich were subject to covenants-not-to-compete with WAGO, and their employment as sales representatives with Appellant WEEU violated the covenants-not-to-compete. The record demonstrates that Appellant Kline was aware of the covenants-not-to-compete because he was a former employee of WAGO, and his actions in hiring Fink and Ulrich on behalf of his principal, Appellant Reading Eagle, harmed the contractual relations between Fink, Ulrich and WAGO. Appellants did not have a privilege or justification for

these actions. WAGO suffered damages in the form of lost radio sales and radio sales clients as a result of the actions of Appellants, and, therefore, its value as a radio station decreased. Accordingly, we are satisfied that the trial court did not err when it refused to enter judgment in Appellants' favor with respect to this claim.

¶ 35 Next, we consider whether Appellants unfairly competed with WAGO by inducing Fink and Ulrich, two of WAGO's best sales representatives, to leave WAGO for employment with Appellant WEEU. Offering employment to another company's at-will employee is not actionable in and of itself. *Albee Homes, Inc. v. Caddie Homes, Inc.*, 417 Pa. 177, 182, 207 A.2d 768, 771 (1965). However, systematically inducing employees to leave their present employment is actionable "when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employees." *Id.*, at 182, 207 A.2d at 771 (*quoting Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 633–634, 136 A.2d 838, 847 (1957)). Further, when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection. *Albee Homes*, at 182, 207 A.2d at 771 (citation omitted).

¶ 36 The record shows that after Fink and Ulrich began working for Appellant WEEU, they began to call former advertisement customer accounts held with WAGO. N.T. Trial, 7/24/2001, at 256–261; *Id.*, 7/25/2001, at 299–302. Fink and Ulrich called these accounts with the knowledge and permission of Appellant Kline, their supervisor at WEEU and former supervisor at WAGO. *Id.*, 7/24/2001, at 232–233. Nichols, a former general manager

of WAGO and WIOV, testified that the loss of Fink and Ulrich resulted in a loss of several sales clients from WAGO. *Id.*, 7/25/2001, at 356. Accordingly, a jury would be able to infer from these facts that Appellant Kline, acting as an agent for Appellant WEEU and Appellant Reading Eagle, hired WAGO's former employees to entice WAGO's former advertisement customers to place their ads with Appellant WEEU. Consequently, Appellants could be found liable for unfair competition on that basis. Therefore, the trial court did not err when it did not enter judgment in Appellants' favor with respect to this claim.

¶ 37 Lastly, we consider the sufficiency of the evidence with respect to WAGO's cause of action for civil conspiracy. In *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979), our Supreme Court held that in order to prosecute successfully a claim of civil conspiracy, "[a plaintiff must show] that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." Proof of malice, *i.e.*, an intent to injure, is an essential part of a conspiracy cause of action; this unlawful intent must also be without justification. *Id.*, at 211, 412 A.2d at 472. Further, a civil conspiracy is not actionable until "some overt act is done in pursuance of the common purpose or design [ . . . ] and actual legal damage results[.]" *Baker v. Rangos*, 229 Pa.Super. 333, 324 A.2d 498, 506 (1974). All of the above elements may be proven circumstantially by subsequent acts of the alleged conspirators, provided that the evidence is "full, clear and satisfactory." *See Rumbaugh v. Beck*, 411 Pa.Super. 220, 601 A.2d 319, 325 (1991).

¶ 38 After a thorough review of the record, we are satisfied that WAGO presented sufficient evidence to indicate

that a conspiracy existed between Appellant Kline, while still in WAGO's employment, and Appellants WEEU and Reading Eagle to hire away Fink and Ulrich in violation of their covenants-not-to-compete. As our Supreme Court held in *Novic v. Fenics*, 337 Pa. 529, 11 A.2d 871 (1940):

> When [a] plaintiff [...] relies on subsequent acts to establish the conspiracy, these acts must be such as to clearly indicate the prior collusive combination [...], not slight circumstances of suspicion, and these subsequent acts must be such as to warrant the belief and justify the conclusion that the subsequent acts were done in furtherance of the unlawful combination [...].

*Fenics,* at 535, 11 A.2d at 874.

¶ 39 Appellant Kline informed Fink and Ulrich of his impending departure from WAGO and new employment at Appellant WEEU. Later, Appellant Kline inquired on behalf of both Fink and Ulrich with Appellant WEEU regarding the availability of sales representative jobs with Appellant WEEU. Shortly after Appellant Kline tendered his resignation letter to WAGO, Fink and Ulrich also resigned. N.T. Trial, 7/24/2001, at 49. Appellant Kline, on Fink's request, informed her of sales representative positions at Appellant WEEU and formed an "understanding" that an opportunity to take a sales position would be available for her. The record discloses that Appellant Kline held discussions with Ulrich at his home before the two went to work for Appellant WEEU, whereat Appellant Kline and Ulrich discussed details regarding Ulrich's employment for Appellant WEEU such as Ulrich's future salary. *Id.,* 7/25/2001, at 291. At all times, Ulrich believed that Appellant Kline had the authority to hire him for Appellant WEEU. *Id.* at 294. Thereafter, on the day that Appellant Kline began work at Appellant WEEU, he hired both Fink and Ulrich as sales representatives.

¶ 40 This evidence indicates that Appellant WEEU or Appellant Reading Eagle agreed to hire Fink and Ulrich *prior to the commencement of Appellant Kline's employment.* It was necessary for WAGO's case to demonstrate this salient fact, because, Appellant Kline could not engage in a conspiracy with Appellant WEEU or Reading Eagle *after* he was hired by them and became their agent. *See, e.g., Daniel Adams Assoc. v. Rimbach Pub., Inc.,* 360 Pa.Super. 72, 519 A.2d 997 (1987) (a corporation cannot conspire with itself). Malice is shown in this agreement because it was made between Appellants in reckless disregard of both Appellant Kline's duty of loyalty to WAGO and WAGO's contract rights with Fink and Ulrich at a time when WAGO's sales staff was short-handed. As shown above, the consequence of the loss of Fink and Ulrich was a precipitous drop in WAGO's sales performance, which corresponded to WAGO's decline in value. Accordingly, Appellants' argument fails.

¶ 41 Appellants also contend that WAGO failed to prove damages. In support of this contention, Appellants attempt to re-argue their first two claims. We have already determined that these claims are without merit, and, accordingly, we dismiss Appellants' argument. Accordingly, Appellants' claim fails.

¶ 42 We now consider whether the trial court erred by failing to enter a directed verdict in Appellants' favor regarding WAGO's claim for punitive damages or by failing to remit the award. Appellants contend that their actions do not rise to the level of outrageousness required to establish a basis for punitive damages. We disagree.

¶ 43 In *Judge Tech. Servs. v. Clancy,* 813 A.2d at 888–889, we stated:

Punitive damages are awarded to punish a defendant for certain outrageous acts and to deter him **or others** from engaging in similar conduct. Under Pennsylvania law, a reasonable relationship must still exist between the nature of the cause of action underlying the compensatory award and the decision to grant punitive damages.

[...] If no cause of action exists, then no independent action exists for a claim of punitive damage since punitive damages is only an element of damages. To this extent, punitive damages must, by necessity, be related to the injury-producing cause of action.

The degree of reprehensibility is the primary indicator of the reasonableness of a punitive damages award. The reprehensibility inquiry takes into consideration the fact that some wrongs are more blameworthy than others.

Importantly,

The standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant. [...]. Moreover, in Pennsylvania, punitive damages are awarded for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others. An amount of an award of punitive damages will not be reversed unless it shocks the Court's sense of [conscience].

(citations and quotation marks omitted) (emphasis in original).

¶ 44 The evidence presented to the jury in this case indicates that the conduct of Appellants was outrageous. Appellant WEEU and Appellant Reading Eagle's agreement with Appellant Kline to hire Fink and Ulrich in derogation of their contractual obligation to WAGO coupled with the complicity of Appellant WEEU and Appellant Reading Eagle in Appellant Kline's breach of loyalty as a result of the formation of that agreement leaves this Court with little doubt that punitive damages were assessed properly in this case. It is of no moment that Appellant WEEU and Appellant Reading Eagle did not, as Appellant argues, owe a duty of loyalty to WAGO. The evidence suggests that Appellant WEEU and Appellant Reading Eagle knew that Appellant Kline was soliciting sales employees for them from WAGO in violation of WAGO's covenants-not-to-compete, because Appellant Kline provided Ulrich with salary and employment information obtained from Appellant WEEU and Appellant Reading Eagle. N.T. Trial, 7/25/2001, at 291. Accordingly, we are satisfied with the jury's conclusion that Appellants' conduct was outrageous and that punitive damages were proper in this case.

¶ 45 Appellants argue next that the trial court erred in permitting the testimony of Brill regarding the alleged worth, revenue and cash flow of Appellant Reading Eagle. Appellants contend that the sole purpose of Brill's testimony was to influence the jury improperly with regard to its deliberations on punitive damages. The record indicates that Brill was asked the following regarding the proposed sale of WAGO to Appellant Reading Eagle:

MR. TREBILCOCK: When you were in Evansville, what led you to believe that [Appellant Reading Eagle] could even meet your conditions as far as purchase price?

MR. BRILL: Well, based on my experience and the media business and newspaper business, and also based on public information that was available, as to advertising lineage of [Appellant Reading Eagle], it was a company worth at least 150 million

dollars, with 35 million dollars in revenue. And if operated on a normal basis, it would have 10 to 20 million dollars in cash flow.

MR. THOMAS: I object. He is testifying of his opinion, of somebody else's value. He has established no basis for it. It's hearsay, I believe.

THE COURT: I think he said public information.

MR. TREBILCOCK: What was the public information, I will ask that question.

MR. BRILL: The public information were [sic] advertising lineage figures that were published in Editor Published Magazine regularly in that area, until just recently. That let people in the industry have a feel, market-by-market, as to how business was. And there were stated figures for [Appellant Reading Eagle] which -

MR. THOMAS: Objection. The best evidence rule requires if he is referring to a public record, that the public record be in court. This was his witness's recollection of a public record. I object to it, and move to strike.

MR. TREBILCOCK: Your Honor, the witness is recalling what the reason was that he -

THE COURT: He can give us the reason. I don't want to hear the figure. The question is, upon what have you based your opinion? The answer is, this book. That's it.

N.T. Trial, 7/26/2001, at 522–523.

¶ 46 Even if we assume, *arguendo*, that Brill's testimony was inadmissible

hearsay, we are unable to find that Appellants suffered prejudice with respect to the punitive damage award assessed against them because the polestar for the jury's assessment of punitive damages is the outrageous conduct of the defendants, not evidence of a defendant's wealth. *See Shiner v. Moriarty*, 706 A.2d 1228, 1242 (Pa.Super.1998). Further, evidence of wealth is not mandatory to establish a claim for punitive damages. *Shiner*, 706 A.2d at 1241. Therefore, the jury could have based its award of punitive damages entirely on its assessment of Appellants' conduct. Secondly, Appellants failed to present a motion to strike or request a curative instruction with respect to the testimony regarding the actual value of Appellant Reading Eagle proffered by Brill. Accordingly, we are satisfied that whatever error the trial court committed with respect to the receipt of this testimony was harmless.[3]

¶ 47 Appellants next argue that the trial court erred in permitting the testimony of Brill concerning statements made by Larry Orkus (Orkus), assistant publisher of Appellant Reading Eagle, during settlement negotiations. Appellant concedes that Brill's testimony was cumulative to other testimony presented by Orkus but, nevertheless, was inadmissible and prejudicial under Pa.R.E. 408 (inadmissibility of settlement offers). A review of the record indicates that neither the testimony of Orkus nor Brill mentions that a settlement conversation occurred *in this*

---

**3.** We also note that the punitive damage award is not unconstitutionally excessive. Recently, in *State Farm Mutual Automobile Ins. Co., v. Campbell*, —— U.S. ——, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), The United States Supreme Court stated, "Our jurisprudence and the principles it has now established demonstrate [...] that, in practice, few

awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, at ——, 123 S.Ct. at 1524. The ratio between punitive damages and compensatory damages in this case is slightly greater than a 2 to 1 ratio.

*case.* Rather, the testimony of both Orkus and Brill establishes only that Appellant WEEU and Appellant Reading Eagle had previously hired a WAGO employee in violation of the employee's covenant-not-to-compete and settled the case prior to litigation.

¶ 48 Generally, evidence of prior settlements is inadmissible at trial on any matter. *See* 42 Pa.C.S.A. § 6141(c). However, Appellants failed to object when WAGO elicited testimony from Orkus with regard to the previous settlement between the parties. Therefore, the evidence presented to the jury in the testimony of Orkus, while inadmissible, was heard by the jury as a result of Appellants' failure to object. Consequently, the testimony presented by Brill on this subject was cumulative to that heard by the jury *via* Appellants' error and could not further prejudice Appellants. Thus, whatever error may have been committed by the trial court in the admission of Brill's testimony was harmless due to Appellants' failure to object at the appropriate point. Accordingly, Appellants' claim fails.

¶ 49 Lastly, Appellants claim that the trial court erred in failing to grant its Motions for Judgment of *Non–Pros.* Appellants argue that their Motions should have been granted because the Supreme Court's rule regarding Motions for Judgments of *Non Pros* in *Penn Piping, Inc., v. Ins. Co. of North America,* 529 Pa. 350, 603 A.2d 1006 (1992) *overruled by Jacobs v. Halloran,* 551 Pa. 350, 710 A.2d 1098 (1998), was in effect at the time the motions were filed. The old *Penn Piping* rule presumed prejudice against a defendant where the docket indicated a delay in prosecution of an action by a plaintiff for a period greater than two years. *Penn Piping,* at 356, 603 A.2d at 1009. In *Jacobs,* the Supreme Court overruled *Penn Piping,* holding that its adoption of a pre-

sumption of prejudice was improper. *Jacobs,* at 356, 710 A.2d at 1102. The Supreme Court held that the proper test for whether a Motion for Judgment of *Non–Pros* should be granted was the three-part test enunciated by *James Bros. Co. v. Union Banking and Trust Co. of DuBois,* 432 Pa. 129, 247 A.2d 587 (1968), which held:

> A Court may properly enter a judgment of non pros when a party to the proceeding has shown a want of due diligence in failing to proceed with reasonable promptitude, and there has been no compelling reason for the delay, and the delay has caused some prejudice to the adverse party, such as the death of or unexplained absence of material witnesses.

*James Bros.,* at 132, 247 A.2d at 589.

¶ 50 The Supreme Court held further that the rule announced in *James Bros.* required a demonstration of actual prejudice to the defendant and that the resuscitated *James Bros.* rule would apply to "all pending cases where the issue has been preserved." *See Jacobs,* at 358, 710 A.2d at 1103; *see also id.,* at 359 n. 9, 710 A.2d at 1103 n. 9. Thus, contrary to Appellants' argument, the rule announced in *Jacobs* applies to this case, despite the fact it was not announced until after their Motions were denied by the trial court. The issue was preserved by virtue of their Motions, and, thus, it was "pending" within the meaning of *Jacobs.* Accordingly, we are now bound to apply the rule set forth in *Jacobs. Id.,* at 359 n. 9, 710 A.2d at 1103, n. 9.

¶ 51 Applying the *Jacobs* rule to the present case, we are unable to find any prejudice accruing to Appellants with regard to the delays in this litigation. For the most part, the delays in this litigation resulted from Appellants' failure to comply with WAGO's discovery requests. Fur-

ther, after this case appeared on the trial court's termination list, Appellants stipulated that they would not object to the case remaining open. *See* Parties' Stipulation of Discovery Schedule, 3/3/2000. Thus, we are satisfied that Appellants suffered no actual prejudice from the delays in this litigation. Accordingly, Appellants' final claim fails.

¶ 52 As each of Appellants' claims fails, we affirm the judgment of the trial court.

¶ 53 Judgment affirmed.