J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17,
J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC.,  GRISTMILL PROPERTIES INC., SYRACUSE HILTON  HEAD HOLDING, LP, WENDINGCREEK 3656  LLC,HILTON HEAD COMMUNICATIONS LP, HIGHLAND VIDEO ASSOCIATESLP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP,HIGHLAND HOLDING  II, HIGHLANDPREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS  INC, ILIAD HOLDINGA,NCAA HOLDINGS, INC., DORIS HOLDINGSLP DORELLENIC,DOBAIRE  DESIGNS, COUDERSPORT THEATRE, COUDERSPORT  TELEVISION CABLE CO., RIGAS ENTERTAINMENT  LTD, TIMOTHY RIGAS, JOHN J. RIGAS,  MICHAEL J. RIGAS, JAMES P. RIGAS,  WENDING CREEEK FARMS INC., ZITO I,LP  AND ZIITO MEDIA, LP., <br><br> APPEAL OF: JAMES RIGAS <br><br> v. <br><br> DELOITTE & TOUCHE, LLP Appellant | IN THE SUPERIOR COURT OF PENNSYLVANIA <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> No. 1311 EDA 2016 |

Appeal from the Order December 10, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  March Term 2004 No. 040306280

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17, J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC., GRISTMILL PROPERTIES INC., SYRACUSE HILTON HEAD HOLDING, LP, WENDINGCREEK 3656 LLC,HILTON HEAD COMMUNICZITO I, LPATIONS LP, HIGHLAND VIDEO ASSOCIATESLP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP,HIGHLAND HOLDING II, HIGHLANDPREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS INC, ILIAD HOLDINGA,NCAA HOLDINGS, INC., DORIS HOLDINGSLP DORELLENIC,DOBAIRE DESIGNS, COUDERSPORT THEATRE, COUDERSPORT TELEVISION CABLE CO., RIGAS ENTERTAINMENT LTD, TIMOTHY RIGAS, JOHN J. RIGAS, MICHAEL J. RIGAS, JAMES P. RIGAS, WENDING CREEEK FARMS INC., ZITO I,LP AND ZIITO MEDIA, LP., <br><br>APPEAL OF: ZITO I, LP <br><br>v. <br><br>DELOITTE & TOUCHE, LLP | IN THE SUPERIOR COURT OF PENNSYLVANIA <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>No. 1312 EDA 2016 |

Appeal from the Order December 10, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): March Term 2004 No. 040306280

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17, J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC., GRISTMILL PROPERTIES INC., SYRACUSE HILTON HEAD HOLDING, LP, WENDINGCREEK 3656 LLC,HILTON HEAD COMMUNICATIONS LP, HIGHLAND VIDEO ASSOCIATES LP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP, HIGHLAND HOLDING II, HIGHLAND PREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS INC, ILIAD HOLDINGS,NCAA HOLDINGS, INC., DORIS HOLDINGS LP, DORELLENIC,DOBAIRE DESIGNS, COUDERSPORT THEATRE, COUDERSPORT TELEVISION CABLE CO., RIGAS ENTERTAINMENT LTD, TIMOTHY RIGAS, JOHN J. RIGAS, MICHAEL J. RIGAS, JAMES P. RIGAS, WENDING CREEK FARMS INC., ZITO I,LP AND ZITO MEDIA, LP., <br><br> APPEAL OF: ZITO MEDIA, L.P. <br><br> v. <br><br> DELOITTE & TOUCHE, LLP | IN THE SUPERIOR COURT OF PENNSYLVANIA <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> No. 1313 EDA 2016 |

Appeal from the Order March 22, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): March Term 2004 No. 040306280

- 3 -

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17, J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC., GRISTMILL PROPERTIES INC., SYRACUSE HILTON HEAD HOLDING, LP, WENDING CREEK 3656 LLC,HILTON HEAD COMMUNICATIONS LP, HIGHLAND VIDEO ASSOCIATES LP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP,HIGHLAND HOLDING II, HIGHLAND PREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS INC, ILIAD HOLDINGA,NCAA HOLDINGS, INC., DORIS HOLDINGSLP DORELLENIC,DOBAIRE DESIGNS, COUDERSPORT THEATRE, COUDERSPORT TELEVISION CABLE CO., RIGAS ENTERTAINMENT LTD, TIMOTHY RIGAS, JOHN J. RIGAS, MICHAEL J. RIGAS, JAMES P. RIGAS, WENDING CREEEK FARMS INC., ZITO I,LP AND ZIITO MEDIA, LP., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: ZITO MEDIA, L.P. | |
| v. | |
| DELOITTE & TOUCHE, LLP | No. 1314 EDA 2016 |

Appeal from the Order December 27, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): March Term 2004 No. 040306280

- 4 -

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17, J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC.,  GRISTMILL PROPERTIES INC., SYRACUSE HILTON  HEAD HOLDING, LP, WENDING CREEK 3656  LLC,HILTON HEAD COMMUNICATIONS LP, HIGHLAND VIDEO ASSOCIATES LP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP,HIGHLAND HOLDING  II, HIGHLAND PREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS  INC, ILIAD HOLDINGS,NCAA HOLDINGS, INC., DORIS HOLDINGS LP, DORELLENIC,DOBAIRE  DESIGNS, COUDERSPORT THEATRE, COUDERSPORT  TELEVISION CABLE CO., RIGAS ENTERTAINMENT  LTD, TIMOTHY RIGAS, JOHN J. RIGAS,  MICHAEL J. RIGAS, JAMES P. RIGAS,  WENDING CREEK FARMS INC., ZITO I,LP  AND ZITO MEDIA, LP., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: ZITO I, L.P. | |
| v. | |
| DELOITTE & TOUCHE, LLP | No. 1315 EDA 2016 |

Appeal from the Order December 27, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  March Term 2004 No. 040306280

- 5 -

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17, J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC.,  GRISTMILL PROPERTIES INC., SYRACUSE HILTON  HEAD HOLDING, LP, WENDING CREEK 3656  LLC,HILTON HEAD COMMUNICATIONS LP, HIGHLAND VIDEO ASSOCIATES LP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP,HIGHLAND HOLDING  II, HIGHLAND PREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS  INC, ILIAD HOLDINGS,NCAA HOLDINGS, INC., DORIS HOLDINGS LP, DORELLENIC,DOBAIRE  DESIGNS, COUDERSPORT THEATRE, COUDERSPORT  TELEVISION CABLE CO., RIGAS ENTERTAINMENT  LTD, TIMOTHY RIGAS, JOHN J. RIGAS,  MICHAEL J. RIGAS, JAMES P. RIGAS,  WENDING CREEK FARMS INC., ZITO I,LP  AND ZITO MEDIA, LP., | IN THE SUPERIOR COURT OF PENNSYLVANIA |

APPEAL OF: JAMES RIGAS

v.

| | |
|---|---|
| DELOITTE & TOUCHE, LLP | No. 1316 EDA 2016 |

Appeal from the Order December 27, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  March Term 2004 No. 040306280

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17,
J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC.,  GRISTMILL PROPERTIES INC., SYRACUSE HILTON  HEAD HOLDING, LP, WENDING CREEK 3656  LLC,HILTON HEAD COMMUNICATIONS LP, HIGHLAND VIDEO ASSOCIATES LP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP,HIGHLAND HOLDING  II, HIGHLAND PREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS  INC, ILIAD HOLDINGS,NCAA HOLDINGS, INC., DORIS HOLDINGS LP, DORELLENIC,DOBAIRE  DESIGNS, COUDERSPORT THEATRE, COUDERSPORT  TELEVISION CABLE CO., RIGAS ENTERTAINMENT  LTD, TIMOTHY RIGAS, JOHN J. RIGAS,  MICHAEL J. RIGAS, JAMES P. RIGAS,  WENDING CREEK FARMS INC., ZITO I,LP  AND ZITO MEDIA, LP., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: JOHN RIGAS | |
| v. | |
| DELOITTE & TOUCHE, LLP | No. 1317 EDA 2016 |

Appeal from the Order December 27, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  March Term 2004 No. 040306280

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17,
J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC., GRISTMILL PROPERTIES INC., SYRACUSE HILTON HEAD HOLDING, LP, WENDING CREEK 3656 LLC,HILTON HEAD COMMUNICATIONS LP, HIGHLAND VIDEO ASSOCIATES LP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP,HIGHLAND HOLDING II, HIGHLAND PREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS INC, ILIAD HOLDINGS,NCAA HOLDINGS, INC., DORIS HOLDINGS LP, DORELLENIC,DOBAIRE DESIGNS, COUDERSPORT THEATRE, COUDERSPORT TELEVISION CABLE CO., RIGAS ENTERTAINMENT LTD, TIMOTHY RIGAS, JOHN J. RIGAS, MICHAEL J. RIGAS, JAMES P. RIGAS, WENDING CREEK FARMS INC., ZITO I,LP AND ZITO MEDIA, LP., | IN THE SUPERIOR COURT OF PENNSYLVANIA |

APPEAL OF: JAMES RIGAS

v.

| | |
|---|---|
| DELOITTE & TOUCHE, LLP | No. 1318 EDA 2016 |

Appeal from the Order January 21, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): March Term 2004 No. 040306280

- 8 -

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17,
J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

| | |
|---|---|
| ISLAND PARTNERS, INC., ROUMALI, INC., GRISTMILL PROPERTIES INC., SYRACUSE HILTON HEAD HOLDING, LP, WENDING CREEK 3656 LLC,HILTON HEAD COMMUNICATIONS LP, HIGHLAND VIDEO ASSOCIATES LP, HIGHLAND PRESTIGE GEORGIA INC., HIGHLAND COMMUNICATIONS LLP,HIGHLAND HOLDING II, HIGHLAND PREFERRED COMMUNICATIONS LLC, HIGHLAND HOLDINGS, ELENI INTERIORS INC, ILIAD HOLDINGS,NCAA HOLDINGS, INC., DORIS HOLDINGS LP, DORELLENIC,DOBAIRE DESIGNS, COUDERSPORT THEATRE, COUDERSPORT TELEVISION CABLE CO., RIGAS ENTERTAINMENT LTD, TIMOTHY RIGAS, JOHN J. RIGAS, MICHAEL J. RIGAS, JAMES P. RIGAS, WENDING CREEK FARMS INC., ZITO I,LP AND ZITO MEDIA, LP., <br><br> APPEAL OF: ZITO I, L.P. <br><br> v. <br><br> DELOITTE & TOUCHE, LLP | IN THE SUPERIOR COURT OF PENNSYLVANIA <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> No. 1319 EDA 2016 |

Appeal from the Order January 21, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): March Term 2004 No. 040306280

BEFORE: LAZARUS, OTT, and FITZGERALD,* JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED OCTOBER 27, 2017**

This action arises from the 2002 failure of Adelphia Communications

Corporation ("Adelphia") and ensuing civil and criminal investigations.    In

---

* Former Justice specially assigned to the Superior Court.

2004, Appellants John Rigas, James Rigas, Zito I, L.P. ("Zito I") and Zito Media, L.P. ("Zito Media") (collectively "Appellants") and other plaintiffs filed a civil complaint in the Philadelphia Court of Common Pleas against Deloitte & Touche LLP ("Deloitte"), the former accountant and auditor for Adelphia and other entities managed by Adelphia, for Deloitte's alleged role in Adelphia's failure. In essence, the complaint alleged that Deloitte directed the accounting decisions that ultimately ruined Adelphia but then refused to stand behind these decisions once the federal government began to investigate Adelphia.

In 2005, Deloitte removed the case to the United States Bankruptcy Court for the Eastern District of Pennsylvania. The federal Judicial Panel on Multidistrict Litigation ("JPML") then transferred the case to the United States District Court for the Southern District of New York ("District Court") as part of multidistrict litigation ("MDL") relating to Adelphia's collapse. The District Court entered two orders dismissing most of Appellants' claims[1] and remanded the remaining claims (three claims by Zito Media) to the Philadelphia Court of Common Pleas. Subsequently, the Court of Common Pleas granted summary judgment to Deloitte on Zito Media's remaining claims on the ground that Zito Media's expert report failed to provide a

---

[1] The first order granted, in part, Deloitte's motion to dismiss Appellants' amended complaint, while the second granted, in part, Deloitte's motion for summary judgment on Appellants' second amended complaint. For convenience, we refer to both orders collectively as the "dismissal orders."

reasonable calculation of its damages. These nine appeals followed, which we have consolidated for purposes of disposition.

In the appeals at 1311, 1312, and 1314-1319 EDA 2016, Appellants ask us to review the dismissal orders that the District Court entered during MDL proceedings. Under *City of Waco v. United States Fidelity & Guaranty Co.*, 293 U.S. 140 (1934), and its progeny, the only court that had jurisdiction to review these rulings was the United States Court of Appeals for the Second Circuit. Because we lack jurisdiction to review the District Court's dismissal orders, we quash these appeals.

In the only remaining appeal at 1313 EDA 2016, we reverse the court's order granting summary judgment against Zito Media because Zito Media's expert provides a reasonable calculation of damages that should go to the jury.

## APPELLANTS' ALLEGATIONS AGAINST DELOITTE

Appellants allege the following: in 1952, John Rigas purchased a cable television franchise for the small town of Coudersport, Pennsylvania. Appellants' Am. Compl., ¶ 10. Over the next thirty years, John acquired additional cable companies. *Id.* ¶ 10, n.2.

In 1985, John hired Deloitte to provide him and his companies with accounting and auditing services. *Id.* ¶¶ 15-17. John ran the companies with his sons James, Timothy, and Michael. In July 1986, they reorganized five of the companies into a single holding company, Adelphia, which they

subsequently took public. *Id.* ¶¶ 14, 19, 22. Rigas family members (including John, James, Timothy, Michael, and members of their immediate families) retained voting control over Adelphia. *Id.* ¶ 22. The family privately owned another set of companies (the "Managed Entities") that Adelphia managed for a fee: Highland Preferred, Highland Prestige, Highland Video, Hilton Head, and Coudersport TV. *Id.* ¶¶ 10-13 & n.3, 27. Coudersport TV's assets eventually were transferred to Zito Media.[2] None of the Managed Entities had any employees. In addition, the Rigas family held partnerships (the "Rigas Family Partnerships" or "RFP's") that owned interests in the Managed Entities and in Adelphia securities. One of the RFP's was Highland Holdings.[3] *Id.* ¶¶ 30-31.

Between 1985 and 2002, Deloitte provided advice to Adelphia and the RFP's with respect to documentation and disclosure of certain transactions between and among these entities known as "related party transactions." Specifically, Deloitte advised that disclosure of receivables and payables among the RFP's, on the one hand, and Adelphia, on the other, should be on a net basis rather than showing each balance individually. *Id.* ¶ 61.

---

[2] It appears that Zito Media does not own any assets other than those transferred by Coudersport TV.

[3] We refer to Rigas family members, Adelphia, the Managed Entities and the RFP's collectively as "the Rigas family."

Adelphia needed substantial capital to implement its business strategy of acquiring new cable systems and increasing its subscriber base by upgrading systems and providing new services. Adelphia raised this new capital mainly through public offerings of securities, private sales of securities to the RFP's, and credit facilities. *Id.* ¶ 67. Deloitte advised on the proper accounting treatment for transactions in which Adelphia acquired capital necessary to purchase new cable systems, upgrade older systems, and provide new services. *Id.* ¶¶ 67-73. These transactions, known as "co-borrowing agreements," turned previously existing RFP credit facilities into "co-borrowing" facilities, with both an RFP and an Adelphia subsidiary named as borrowers. *Id.* ¶ 75. Deloitte advised that funds drawn on co-borrowing agreements did not need to be reflected on Adelphia's balance sheet so long as the RFP had the ability to repay the debt. *Id.* ¶¶ 82, 91.

Deloitte provided advice with regard to Adelphia's financial statements and its filings with the Securities and Exchange Commission ("SEC"). *Id.* ¶¶ 38-39, 53-54. Deloitte provided similar services to the Managed Entities and audited every credit facility into which the Managed Entities entered. *Id.* ¶¶ 41, 43. Relying on Deloitte's advice, the Rigases and their companies incurred hundreds of millions of dollars in debt to invest in Adelphia.

In 1996, an Adelphia entity and one of the Managed Entities entered into a joint "co-borrowing" agreement, the purpose of which was to lend funds to the Rigas family for the purchase of Adelphia securities. *Id.* ¶ 75.

Deloitte's team of accountants reviewed this agreement and learned that it was joint and several, that all borrowers would be responsible for all borrowings made pursuant to the agreement, and that the banks could look to any borrower for repayment. *Id.* ¶¶ 77-81. Deloitte instructed that Adelphia could treat the co-borrowed debt of the Managed Entity as a contingent liability on Adelphia's books. According to Deloitte, so long as the Managed Entity had the ability to repay the debt, no need existed to reflect this debt on Adelphia's balance sheet. *Id.* ¶ 82. Deloitte also concluded that the 1996 co-borrowing agreement did not present any new risk. *Id.* ¶ 84.

Between 1999 and 2001, Adelphia subsidiaries and several RFP's entered into three additional co-borrowing agreements, the last of which included Zito Media as a co-borrower. *Id.* ¶¶ 85-86. The structure of each co-borrowing agreement was similar to the 1996 agreement. *Id.* ¶ 89. Deloitte's advice with respect to each agreement was the same: (1) the Managed Entity debt was a contingent liability of Adelphia that Adelphia need not report on its balance sheet provided that the Rigases had the ability to repay their portion of the co-borrowed debt; and (2) regardless of which co-borrower drew down on the facility, the co-borrower who used the funds should record the debt on its books. *Id.* ¶ 91. Deloitte also advised that Adelphia did not need to include footnotes on its financial statements

describing the total amount of debt borrowed by Managed Entity co-borrowers. *Id.* ¶ 92.

In early 2002, following the Enron debacle, the SEC announced new guidance regarding disclosures of off-balance sheet debt. Deloitte interpreted that guidance as now requiring that Adelphia disclose (1) the existence of co-borrowing facilities, (2) the key terms of co-borrowing agreements, including either party's right to draw the entire amount and joint and several liability, and (3) the off-balance sheet debt, or the amount borrowed under these facilities by the Managed Entities, including Zito Media, that was not reflected on Adelphia's balance sheet. *Id.* ¶ 112.

During a February 28, 2002 audit committee meeting, Deloitte confirmed that the prior co-borrowing disclosure had not been insufficient, but that a different disclosure was necessary due to the SEC's new guidance. *Id.* ¶ 117. Deloitte's presentation included a review of their 2001 audit, which they lauded as one of the best ever for Adelphia. Their presentation also reflected significant direct placements to the Rigases in 2001, several of which correspond directly to draws from co-borrowing facilities by RFP's. *Id.* ¶118. Deloitte representatives stated they "had a very good audit, that they were comfortable with this, and they were fine." *Id.* ¶ 119. As of March 27, 2002, Deloitte had verbally approved substantially the entire draft of the 2001 Adelphia 10-K for filing with the SEC in the next few days and signed off on an earnings press release to be issued by Adelphia. Deloitte's practice

was not to sign off on such a press release until it was confident that the audit was substantially complete. *Id.* ¶ 125.

After extensive review by Deloitte and its outside counsel and concurrence as to the substance of the release, Adelphia issued an earnings report and held a conference call with analysts to discuss the earnings results. Among other things, the earnings release disclosed the amount that the Rigas co-borrowers had borrowed pursuant to the co-borrowing agreements. *Id.* ¶ 126. Following the conference call, issues arose in the marketplace regarding the amount of Managed Entity debt. *Id.* ¶ 128.

Within days, the SEC began investigating Adelphia's accounting treatment and disclosure of the co-borrowing agreements. *Id.* ¶ 129. The Rigases and Adelphia turned to Deloitte for assistance with responding to the SEC, because only Deloitte had the information necessary to defend its accounting determinations. *Id.* ¶ 130. After it became clear that the SEC disagreed over how to account for the co-borrowing agreements, Deloitte decided not to stand by its past accounting decisions and the advice that it consistently had rendered to the Rigases, Adelphia, and the Managed Entities. *Id.* ¶ 131. Instead, Deloitte took steps to distance itself from the controversy surrounding the disclosure regarding the co-borrowing debt. *Id.*

Deloitte substituted its national office for the engagement team that previously had provided advice to Adelphia and Plaintiffs and requested

documentation that the engagement team had already reviewed. *Id.* ¶¶ 132-33. Ultimately, Deloitte refused to sign the audit opinion unless the SEC concurred with its accounting decisions, a step Deloitte had never taken before. *Id.* ¶ 134. According to Appellants, Deloitte placed its own interests above the best interests of its clients. *Id.* ¶ 137.

As a result of Deloitte's refusal to sign the 2001 audit opinion, Adelphia was unable to issue its 2001 10-K, which ultimately led to, *inter alia*, defaults under various agreements, a severe diminution of the value of Adelphia's shares, and Adelphia's shares being delisted by NASDAQ in June of 2002. *Id.* ¶ 138. The harm to Adelphia in turn damaged the Managed Entities, which were co-borrowers with Adelphia and, in some cases, had lent funds to the other entities to purchase Adelphia securities which were severely devalued as a result of Deloitte's actions. *Id.* ¶ 139. The RFP's, whose value was tied to Adelphia's in various ways, lost value as well. *Id.* ¶¶ 139-40.

Following Adelphia's failure, the federal government brought civil and criminal charges against Adelphia and members of the Rigas family. The SEC filed an action against Adelphia and John, James, Timothy, and Michael, and the Department of Justice indicted John and Timothy on criminal charges relating to the practices discussed above, including Adelphia's treatment of netting, co-borrowing arrangements, purchases of Adelphia securities, and marketing support agreements. *Id.* ¶¶ 145-47. John and

Timothy were eventually convicted of conspiracy, securities fraud, and bank fraud. *Id.* ¶ 157.

After their convictions, the Rigas family entered into a global settlement with the government. John Rigas forfeited or transferred to other family members substantially all of his assets, including all of his interests in Adelphia, the Managed Entities and other RFP's, and his non-business assets. *Id.* ¶ 158. James Rigas gave up all of his interests in Adelphia and most of his interests in the Managed Entities and other RFP's. *Id.* ¶ 159. Most of the RFP's were forfeited to the government. *Id.* ¶ 160. Prior to the forfeiture of Highland Holdings, Highland Preferred, Highland Prestige, Highland Video and Hilton Head to the United States, these entities assigned all of their assets that they did not retain in order to comply with the Government-Rigas settlement agreement to John Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis, including the entities' interests in claims against Deloitte. *Id.* ¶ 161. In turn, John Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis transferred and assigned the assets and rights received from the entities to Zito I. *Id.* ¶ 162. According to the amended complaint, the United States consented to the transfer of assets, including the entities' litigation rights against Deloitte, during the course of negotiations leading to the Government-Rigas

Settlement Agreement. *Id.* ¶ 163. Coudersport TV was not forfeited to the government; its assets were transferred to Zito Media. *Id.* ¶ 164.[4]

## PROCEDURAL HISTORY

On March 26, 2004, Appellants filed a civil complaint against Deloitte in the Court of Common Pleas. Deloitte removed this action to Bankruptcy Court on the ground that it was related to Adelphia's pending bankruptcy proceedings. The JPML thereupon transferred the case to the District Court as part of MDL proceedings involving Adelphia. After transfer, the District Court stayed the case while other cases in the MDL moved forward, including a securities class action against Deloitte. On May 7, 2013, the District Court ordered this case to proceed.

On June 6, 2013, Appellants filed a single amended complaint against Deloitte alleging breach of contract, breach of professional duty, negligent misrepresentation, tortious interference, breach of fiduciary duty, contribution and indemnity. Zito I alleged that it had standing as successor-in-interest to Highland Holdings, Highland Preferred, Highland Prestige, Highland Video and Hilton Head. Zito Media asserted that it had standing as successor-in-interest to Coudersport TV.

Deloitte filed a motion to dismiss the amended complaint. In an order and opinion dated December 27, 2013, the District Court dismissed (1) all

---

[4] We will discuss further evidence below on pages 36-39 in connection with Zito Media's appeal at 1313 EDA 2016.

claims by John Rigas under the doctrine of *in pari delicto* and (2) all claims by James Rigas, Zito I and Zito Media except these plaintiffs' tort actions for professional negligence and negligent misrepresentation.

The District Court granted the motion of James Rigas, Zito I and Zito Media for leave to file a second amended complaint ("SAC") repleading its claim for breach of contract. Subsequently, Deloitte moved for summary judgment on all clams in the SAC. In an opinion and order on December 10, 2014, the District Court held that (1) Zito I lacked standing to bring any negligence or contract claims against Deloitte, (2) James Rigas failed to state a cause of action on his remaining contract and negligence claims, and (3) Deloitte failed to demonstrate that it was entitled to judgment as a matter of law against Zito Media on its contract and negligence claims. Accordingly, the District Court entered summary judgment in favor of Deloitte except for Zito Media's claims of breach of contract, professional negligence and negligent misrepresentation.

Zito I and James Rigas moved for reconsideration, but on January 21, 2015, the District Court denied reconsideration and ordered the Clerk to remand Zito Media's case to Philadelphia County. Because Appellants' action against Deloitte was the last matter in the MDL proceedings, the District Court directed the Clerk to close MDL proceedings and notify the JPML of this closure.

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17, J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

Following remand, Deloitte moved for summary judgment on Zito Media's remaining contract and tort claims on the ground that Zito Media failed to prove damages. On March 22, 2016, the Court of Common Pleas granted summary judgment in favor of Deloitte. These appeals followed. Specifically:

> (1) At 1311 EDA 2016, James Rigas appealed the District Court's dismissal orders;
>
> (2) At 1312 EDA 2016, Zito I appealed the District Court's dismissal orders;
>
> (3) At 1313 EDA 2016, Zito Media appealed the Court of Common Pleas' order granting summary judgment to Deloitte on the claims remanded to state court;
>
> (4) At 1314 EDA 2016, Zito Media appealed the District Court's dismissal orders;
>
> (5) At 1315 EDA 2016, Zito I joined in Zito Media's appeal at 1314 EDA 2016;
>
> (6) At 1316 EDA 2016, James Rigas joined in Zito Media's appeal at 1314 EDA 2016;
>
> (7) At 1317 EDA 2016, John Rigas appealed the District Court's dismissal orders;
>
> (8) At 1318 EDA 2016, James Rigas appealed the District Court's dismissal orders and its order denying reconsideration; and
>
> (9) At 1319 EDA 2016, Zito I appealed the District Court's dismissal orders and its order denying reconsideration.

The Court of Common Pleas did not order Appellants to file statements of errors complained of on appeal.

- 21 -

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17,
J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

## QUESTIONS RAISED ON APPEAL

James Rigas raises the following questions in his appeals at 1311 EDA

2016 and 1318 EDA 2016:

> A. Did the [District Court] err in ignoring unrefuted evidence adduced by [James Rigas] in granting summary judgment against him?
>
> B. Did the [District Court] err in refusing to apply Section 552 of the Restatement (Second) of Torts with respect to [James Rigas'] negligent misrepresentation claim against his accountant?

James Rigas' Brief, 1311 & 1318 EDA 2016, at 4.

John Rigas raises the following questions in his appeal at 1317 EDA

2016:

> A. Did the [District Court] err in relying upon [John Rigas'] federal convictions in dismissing his claims pursuant to *in pari delicto* where the factual conduct giving rise to the convictions is not apparent from the general jury verdict?
>
> B. Did the [District Court] err in dismissing [John Rigas'] claim pursuant to *in pari delicto* without considering policy considerations in accordance with ***Official Comm. of Unsecured Creditors of AHERF v. PricewaterhouseCoopers, LLP***, 989 A.2d 313 (Pa. 2010)?

John Rigas' Brief, 1317 EDA 2016, at 4.

Zito I raises the following questions in its appeal at 1312 EDA 2016

and 1319 EDA 2016:

> A. Did the [District Court] err in dismissing [Zito I's] claims for lack of constitutional standing instead of remanding them to the state court from which they were removed?

- 22 -

B. Did the [District Court] err in dismissing [Zito I's] claims based on a lack of standing when the evidence adduced demonstrated that [Zito I's] predecessors in interest had assigned the claims against [Deloitte] to plaintiff?

C. Did the [District Court] err in applying the parol evidence rule to bar evidence of an assignment based upon a contract to which [Deloitte] was not a party?

D. Did the [District Court] err in determining that plaintiff lacked standing to pursue a claim transferred to it when the transfer of the claim was not void but only potentially voidable?

Zito I's Brief, 1312 & 1319 EDA 2016, at 8.

Zito Media raises the following questions in its appeal at 1313 EDA 2016:

Did the [Philadelphia Court of Common Pleas] err in rejecting a damages calculation as a matter of law as pure speculation merely because the expert used combined projections for all of the plaintiff companies, which were operated as a group, before separately allocating value to each particular plaintiff?

Did the [Philadelphia Court of Common Pleas] abuse its discretion in refusing to permit [Zito Media] to correct a perceived deficiency in its expert report on damages even though doing so would not have caused [Deloitte] any prejudice or delayed the scheduled trial?

Zito Media's Brief, 1313 EDA 2016, at 2.

Zito Media raises the following questions in its appeal at 1314 EDA 2016:[5]

---

[5] As noted above, Zito I and James Rigas join in this appeal in their own appeals at 1315 EDA 2016 and 1316 EDA 2016.

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17, J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

> A. Did the [District Court] err in dismissing a tortious interference claim for inadequately pleading intent when plaintiff alleged that [Deloitte] knew that interference was certain or substantially certain to occur as a result of its actions consistent with Sections 8A and 766 of the Restatement (Second) of Torts and the comments thereto?
>
> B. Did the [District Court] err in discounting [Zito Media's] factual allegations supporting a fiduciary relationship between [Zito Media] and [Deloitte] and dismissing [Zito Media's] breach of fiduciary duty claim solely because [Zito Media's] officers were highly-educated?

Zito Media's Brief, 1314 EDA 2016, at 2.

## LACK OF JURISDICTION OVER APPEALS AT 1311, 1312, and 1314-1319 EDA 2016

Appellants challenge the District Court's two dismissal orders in their appeals at 1311, 1312 and 1314-1319 EDA 2016. Deloitte argues that we should quash these appeals due to lack of jurisdiction to review the District Court's orders. According to Deloitte, these orders, coupled with the remand order, "effectively end[ed] the life of the matter in federal court" and made the dismissal orders immediately appealable to the United States Court of Appeals for the Second Circuit. Deloitte's Brief at 1312 and 1319 EDA 2016, at 17-18 (citing **Berman v. Tyco Int'l Ltd.**, 492 Fed. Appx. 152, 154 (2d Cir. 2012)). Since Appellants failed to appeal to the Second Circuit, Deloitte contends, the dismissal orders are no longer subject to review "by any court, either state or federal." Deloitte's Brief at 23 (citing **Carr v. Am. Red Cross**, 17 F.3d 671, 678 (3d Cir. 1994)). Based on our analysis of **City of Waco**, we agree.

- 24 -

To understand ***City of Waco's*** role, we examine these proceedings against the backdrop of statutes that govern removal, MDL and remand proceedings. Deloitte removed Appellants' action to the Bankruptcy Court under 28 U.S.C. § 1452(a)[6] because it was related to Adelphia's pending bankruptcy proceedings. Following removal, the JPML[7] transferred this case to the District Court to coordinate this case with other MDL proceedings pending against Adelphia.[8] The District Court dismissed all but three claims

---

[6] 28 U.S.C. § 1452(a) provides:

> A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

28 U.S.C. § 1452(a).

This case was referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and a standing order of the Eastern District of Pennsylvania. ***See Shubert v. Law Offices of Paul J. Winterhalter***, 531 B.R. 546, 550 (Bankr.E.D.Pa. 2015) ("Pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference for this District, 'any and all proceedings arising under Title 11 or arising in or related to a chapter 7, 11, 12, or 13 case under Title 11 are and shall be referred to the Bankruptcy Judges for the district').

[7] The JPML "consist[s] of seven circuit and district judges designated from time to time by the Chief Justice of the United States . . ." ***Id.*** § 1407(d).

[8] The MDL statute, 28 U.S.C. § 1407, provides in relevant part: "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for

by Appellants, denied reconsideration of the second dismissal order and remanded this action to the Court of Common Pleas pursuant to 28 U.S.C. § 1452(b).[9]

Remand orders **themselves** are "not reviewable on appeal or otherwise by the [federal] courts of appeals." 28 U.S.C. § 1452(b). Further, as a state court, we are bound by the District Court's remand order and must treat it as valid and enforceable. *See Resolution Trust Corp. v. Warwick Nurseries, Ltd.*, 675 A.2d 730, 732 (Pa. Super. 1996) ("state courts are bound by the judgment of federal courts" and must give federal proceedings full faith and credit (citation omitted)). The questions thus become: what is the effect of the remand order? Where and when do Appellants have the right to appeal the dismissal orders that preceded the

---

coordinated or consolidated pretrial proceedings." *Id.* § 1407(a). The transferee court oversees all pretrial and discovery proceedings, but not trial. *Id.* The transfer "shall be made by the [JPML] upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." *Id.*

[9] 28 U.S.C. § 1452(b) provides:

> The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground. An order entered under this subsection remanding a claim or cause of action, or a decision to not remand, is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title.

District Court's remand order?  Appellants maintain that they can wait until the conclusion of post-remand proceedings in the Court of Common Pleas and then appeal the dismissal orders to this Court, as they attempt to do in eight of their nine appeals.  Deloitte counters that Appellants had the right to appeal to the Second Circuit from the District Court, even though the District Court did not dispose of all claims and all parties, and therefore Appellants cannot wait until now to appeal.

*City of Waco* demonstrates that Deloitte is correct: the remand order triggered Appellants' right to appeal the dismissal orders to the Second Circuit.  In *City of Waco*, the plaintiff, a Texas citizen, sued contractors Combs & Glade, also Texas citizens, and the City of Waco, Texas ("the City") in Texas state court alleging state law claims for injuries that the plaintiff incurred when he ran his car into an obstruction in a public street.  *City of Waco*, 293 U.S. at 141.  The City sued the United States Fidelity & Guaranty Company ("USF&G"), a citizen of Maryland and surety on the contractors' bond, alleging, as a matter of state contract law, that USF&G was obligated as surety to pay any liability created against the City by the contractors' acts.  *Id.*  USF&G removed the entire action to federal court, which dismissed the City's action against USF&G on the ground that USF&G was an improper and unnecessary party.  *Id.* at 141-42.  The district court then remanded the case to Texas state court because no basis for federal jurisdiction existed once the claim against USF&G was dismissed from the

- 27 -

case. *Id.* at 142. The City appealed the order dismissing its claim against USF&G to the Fifth Circuit, which dismissed the appeal, "holding that, as no appeal lies from an order of remand, the cause was irrevocably out of the District Court, the action of that court in dismissing the city's cross-action was moot, and its propriety could not be reviewed." *Id.* at 142-43. The United States Supreme Court reversed. The Court held that the district court's remand order was not subject to review, but the order dismissing the claim against USF&G **was** appealable, because "in logic and in fact the decree of dismissal preceded that of remand and was made by the District Court while it had control of the cause. Indisputably this order is the subject of an appeal; and, if not reversed or set aside, is conclusive upon [the City]." *Id.* at 143.

Under *City of Waco*, federal appellate courts have jurisdiction to review decisions that are collateral to the remand order when (1) the decision has a conclusive effect in subsequent proceedings, and (2) the decision can be "disaggregated" from the remand order. *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n.13 (2006). "The holding of [*City of*] *Waco* is that when one case presents two distinct claims for relief, and the district court finally resolves one while remanding the other, the claim that was **not** remanded may be appealed within the federal system." *Daniels v. Liberty Mut. Ins. Co.*, 484 F.3d 884, 888 (7th Cir. 2007) (emphasis in original). The purpose underlying this rule is to provide an

avenue of federal appellate review to parties who otherwise would have no recourse if the district court dismisses some, but not all, of their claims and then orders the case remanded to state court.

Two decisions recognize that *City of Waco* applies to bankruptcy cases involving the same remand statute, section 1452(b), that the District Court applied in the present case. *See Good v. Voest-Alpine Indus., Inc.*, 398 F.3d 918, 922-24 (7th Cir. 2005) (citing *In re Adams*, 809 F.2d 1187, 1188-89 (5th Cir. 1987) (order dismissing party or claim and preceding remand under section 1452(b) is appealable under *City of Waco*)).

Many other decisions provide helpful illustrations of *City of Waco* in non-bankruptcy cases.[10] *See Kircher*, 547 U.S. at 644 n.13; *see also Regan v. Starcraft Marine*, 524 F.3d 627, 631-32 (5th Cir. 2008) (where district court dismissed claim against one defendant and remanded state law claim to state court, appeals court had jurisdiction to review order dismissing federal law claim under *City of Waco*, because it was separable in logic and fact from remand order and would have preclusive effect in subsequent state court proceedings); *Daniels,* 484 F.3d at 888; *LLC Carlson v. Arrowhead*

---

[10] Although non-bankruptcy cases involve a different remand statute, 28 U.S.C. § 1447(d), we find these cases analogous, because section 1447(d) contains similar (albeit not identical) language to section 1452(b), and the rationale for applying *City of Waco* to these cases is the same as in bankruptcy cases.

*Concrete Works, Inc.,* 445 F.3d 1046, 1052 (8th Cir. 2006) (*City of Waco* requires that reviewed decision be conclusive on parties and logically and factually precedent to remand order); *Morris v. T E Marine Corp.*, 344 F.3d 439, 445 (5th Cir. 2003) ("it is absurd to suppose that the proper forum for Morris to appeal a federal district court's summary judgment order is the Louisiana **state** appellate court") (emphasis in original); *Hernandez v. Seminole Cnty.,* 334 F.3d 1233, 1241 (11th Cir. 2003); *Christopher v. Stanley–Bostitch, Inc.,* 240 F.3d 95, 99 (1st Cir. 2001); *Beneficial Consumer Disc. Co. v. Poltonowicz*, 47 F.3d 91, 93 (3d Cir. 1995) (in action involving three parties, where district court dismissed action against one defendant, the IRS, and remanded two parties' claims against one another to state court, order dismissing IRS was appealable under *City of Waco*); *Carr*, 17 F.3d at 678 (order remanding case to state court transformed prior order dismissing one of several defendants into final, appealable order). The Second Circuit, which Deloitte contends is the only court that had jurisdiction to review the District Court's dismissal decisions, has issued an unpublished decision applying *City of Waco*. *See Berman*, 492 Fed. Appx. at 152. There, the district court granted partial summary judgment to the defendant on the plaintiff's federal claim and one state law claim and remanded the remaining state law claims to New York state court. *Id.* at 153. The plaintiff appealed to the Second Circuit, which held that it had jurisdiction to review the dismissal of the federal and state claims: "In

[remanding the case], the district court effectively ended the life of the matter in federal court. Thus the district court's grant of a partial summary judgment has become a final judgment for our purposes." *Id.* at 154.

*City of Waco* and its progeny instruct that when a federal district court dismisses claims or parties and remands the remaining claims to state court, the dismissal order is immediately appealable to the federal court of appeals. If the aggrieved party fails to timely appeal the resolved claim to the federal court of appeals, that claim is beyond review by any court, either state or federal. Because Appellants did not appeal the District Court's dismissal orders and order denying reconsideration to the Second Circuit, they forfeited their right to appeal these orders.

Appellants argue that *City of Waco* only permits appeals to federal appellate court when the district court dismisses federal law claims, but not when the district court only dismisses state law claims, as happened in this case. Zito I's Reply Brief, 1312 and 1316 EDA 2016, at 5. *City of Waco* itself defeats this argument, because no federal claims were involved in that case. Instead, (1) two state law claims were removed to federal district court, (2) the district court dismissed one state law claim and remanded the second claim to state court, and (3) the Supreme Court held that the district court's decision as to the dismissed state law claim was appealable to the Fifth Circuit. *See City of Waco*, 293 U.S. at 141-43. Therefore, so long as the district court's order is conclusive in later proceedings and can be

"disaggregated" from the court's remand order, *Kircher*, 547 U.S. at 644 n.13, the order is subject to immediate appeal to a federal appeals court, regardless of whether it resolves federal claims alone, state claims alone or both federal and state claims.

The test is not the source of the dismissed claims but whether there is anything left for the district court to do other than remand the remaining claims to state court. Here, after dismissing the lion's share of state law claims, there was nothing left for the District Court to do in this case other than remand[11] the remaining claims to state court. Thus, the remand order was equivalent to a final, appealable order that triggered Appellants' right to appeal to the Second Circuit. *Cf. Gelboim v. Bank of Am. Corp.*, 135 S.Ct. 897 (2015) (during MDL proceedings, order granting motion to dismiss one discrete case in its entirety was immediately appealable, even though other cases in MDL docket with unresolved issues remained unappealable).

Appellants also argue that *City of Waco* does not apply when, as here, the state court proceedings were originally removed to Bankruptcy Court under 28 U.S.C. § 1452 due to section 1452(b)'s mandate that "[a]n order remanding a claim or cause of action . . . "is not reviewable by appeal or otherwise by the court of appeals . . ." 28 U.S.C. § 1452(b). We disagree. This statute only prescribes that the remand order itself is not

---

[11] Assuming that the District Court had jurisdiction to issue remand orders in MDL proceedings. *See* n.12, *infra*.

appealable; it does not preclude appeals of decisions collateral to the remand order, such as the present dismissal orders. **See Good**, 398 F.3d at 922-24; **Adams**, 809 F.2d at 1188-89.

Because we lack jurisdiction over Appellants' appeals at 1311, 1312 and 1314-1319 EDA 2016, we are constrained to quash these appeals.[12]

---

[12] One additional comment is necessary. We stated above that we are bound by the District Court's remand order. Our duty is not to determine whether the order is valid but what effect it had on further proceedings.

Had we possessed the authority to review the validity of the remand order, we might have concluded that the District Court lacked jurisdiction to enter a remand order at the conclusion of MDL proceedings. The MDL statute provides that at the conclusion of pretrial proceedings, the action "shall be remanded by the [JPML] . . . to the district from which it was transferred unless it shall have been previously terminated." 28 U.S.C. § 1407(a). Under this provision, the district court assigned to supervise MDL proceedings (the "transferee" court) is not itself authorized to remand the case; it may only suggest that the JPML remand the case to the transferor court. **See In re Wilson**, 451 F.3d 161, 165 n.5 (3d Cir. 2006); **U.S. ex rel. Hockett v. Columbia HCA/Healthcare Corp.**, 498 F.Supp.2d 25, 36 (D.D.C. 2007). This rule applies even when just one case remains on the MDL docket. **See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach**, 523 U.S. 26, 34 (1998); **Wilson**, 451 F.3d at 170.

Thus, although Appellants' action was the final case in a lengthy series of MDL cases relating to Adelphia, one might ask whether the District Court lacked jurisdiction to remand Zito Media's remaining claims to the Court of Common Pleas. If it indeed lacked jurisdiction, all proceedings following the remand order, including the present appeals, are nullities. But because we cannot overrule the District Court's remand order, any challenge to its validity should be addressed to the District Court or the JPML, not us. We express no view as to whether it is too late for any party to challenge this order's validity in federal court.

J-A13037-17, J-A13038-17, J-A13039-17, J-A13040-17, J-A13041-17, J-A13042-17, J-A13043-17, J-A13044-17, J-A13045-17

## APPEAL AT 1313 EDA 2016

With regard to the two claims of Zito Media remaining after remand, which we review together, the Court of Common Pleas granted summary judgment to Deloitte on the ground that Zito Media's damages expert improperly aggregated the valuations of all the Managed Entities and failed to provide a reasonable calculation of damages specific to Zito Media. We conclude that the expert's methodology was reasonable, and that Zito Media should have the opportunity to present his valuation to the jury.

Our review is governed by the following principles:

> [S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party.
>
> *  *  *
>
> This clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment. Contrarily, the trial judge must defer to those conclusions . . . and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact.

***Summers v. Certainteed Corp.***, 997 A.2d 1152, 1159, 1161 (Pa. 2010) (citations and quotation marks omitted). Further,

- 34 -

> the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. On appellate review, then,
>
> > an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals.

*Id.* at 1159 (citations and quotation marks omitted).

To satisfy its burden of proof as to damages, Zito Media had to furnish "only a reasonable quantity of information from which the fact-finder may fairly estimate the amount of damages." ***Delehanty v. First Pennsylvania Bank, N.A.,*** 464 A.2d 1243, 1257 (Pa. Super. 1983).

> [T]he fact-finder . . . may not render a verdict based on speculation or guesswork. Yet, the fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable and inferential, as well as upon direct and positive proof. Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation. While the trier of fact may not use sheer conjecture as a basis for arriving at a verdict, it may use a measure of speculation in aiming at a verdict or an award of damages, and an even greater degree of flexibility is granted in regard to testimony concerning prospective or future damages, which are at best, not always easy or certain of ascertainment and are to a large extent based on probabilities and uncertainties. So then, mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages were the certain result of the defendant's conduct.

*Id.* (citations omitted).

In this case, Zito Media is the successor in interest to Coudersport TV, one of the Managed Entities to whom Deloitte provided accounting services. Zito Media submitted an expert report that Deloitte failed to exercise reasonable care in its advice to the Managed Entities concerning the co-borrowing agreements and its 2001 audit of co-borrowing groups.

Zito Media also retained Jeffrey Brandon of Waller Capital to provide an expert report concerning the damages that Zito Media incurred due to Deloitte's alleged negligence. Brandon has seventeen years of Wall Street experience in valuing cable and related industries. R.R. at 619a.[13]

Brandon explained that the cable industry lends itself to modeling, and that models could form the basis for expert testimony about what the Managed Entities' financial condition would be like today but for Deloitte's conduct. Brandon identified the common variables and metrics used for such valuation purposes, including homes passed growth, basic video subscriber penetration, monthly revenue/basic video subscriber and EBITDA margin. *Id.* at 628a-631a.

Michael Mulcahey, a former Adelphia employee in its treasury department, gathered the historical data and developed models to project the Managed Entities' losses. *Id.* at 794a-802a. Brandon learned that

---

[13] For the parties' convenience, we cite to the reproduced record in the course of summarizing the relevant evidence of Zito Media's damages.

Mulcahey obtained this information from SEC filings and books and records kept by Adelphia and the Managed Entities. *Id.* Brandon also shared his thoughts with Mulcahey about "what a model might look like . . . and how one might go about building a model . . . [and] what common practice is in terms of modeling cable companies." *Id.* at 794a.

Mulcahey developed two models. Brandon tested the metrics in each model and found both models reasonable. *Id.* at 638a. The first model assumed that Deloitte's advice concerning co-borrowing agreements had never occurred, and that there were no co-borrowing agreements between 1999 and 2001. This model took into account historical financial data as of December 31, 1998, prior to the 1999-2001 co-borrowing agreements, and projected the Managed Entities' losses through 2023. *Id.* at 627a. The second model assumed that the Managed Entities entered into the 1999-2001 co-borrowing agreements but did not default due to Deloitte's refusal to issue the audit opinion for the co-borrowing groups' 2001 financials. This model took into account historical financial data as of December 31, 2001 and also projected the Managed Entities' losses through 2023. *Id.*

For each model, Brandon applied three common analytical processes to determine a range of values for the Managed Entities: (1) publicly traded cable company multiples; (2) recent cable company acquisition multiples; and (3) discounted cash flow. *Id.* at 640a, 645a-647a, 650a, 652a. Brandon concluded that but for Deloitte's negligence, under the first model,

the Managed Entities' value ranged between $1.536 to $1.699 billion, and under the second model, their value ranged between $2.191 to $2.436 billion. *Id.* at 722a, 724a. Brandon then apportioned these values between the two plaintiffs in this action, Zito Media, the successor to Coudersport TV, and Zito I, the successor to all other Managed Entities. In the first model, based on subscriber data provided by Mulcahey,[14] Brandon apportioned 3.21% of the Managed Entities' value to Zito Media and the other 96.79% to Zito I, resulting in a damage range for Zito Media between $49 and $55 million. *Id.* at 723a, 826a. In the second model, again based on subscriber data provided by Mulcahey,[15] Brandon apportioned 1.7% of the Managed Entities' value to Zito Media and 98.3% to Zito I, resulting in a damage range for Zito Media between $37 and $41 million. *Id.* at 725a, 826a.

Deloitte argued, and the Court of Common Pleas agreed, that Brandon only provided an aggregate damages figure for the Managed Entities but not a specific damage figure for Zito Media. We disagree. Brandon first provided an aggregate range of damages for the Managed Entities under each model but then calculated a separate damage range for Zito Media—

---

[14] Mulcahey prepared a spreadsheet showing that Coudersport TV owned 3.21% of Managed Entity subscribers for purposes of the first model. R.R. 823a, 826a.

[15] Mulcahey prepared a spreadsheet showing that Coudersport TV owned 1.7% of Managed Entity subscribers for purposes of the second model. R.R. 824a, 828a.

between $49 and $55 million under the first model and between $37 and $41 million in the second model.

In ***Reading Radio, Inc. v. Fink***, 833 A.2d 199 (Pa. Super. 2003), this Court approved valuation methodology similar to Brandon's. The plaintiff's expert in ***Reading Radio*** valued two radio stations as a package and then deriving a separate value for the station in question. ***Id.*** at 209. The expert observed that the radio industry would view the stations as a "combination," thus giving the station in question a higher value than if it were alone. ***Id.*** Moreover, the expert ultimately provided a separate value for the station in question. ***Id.*** Analogously, in this case, Zito Media asserted that Coudersport TV was not operated by itself but as part of the Managed Entities, which benefited collectively from operating efficiencies and group buying power. R.R. 811a (declaration of James Rigas). Thus, Zito Media has a reasonable basis for arguing that Brandon could take the Managed Entities' aggregate value into account when computing Zito Media's damages.

According to Deloitte, two decisions—***Stevenson v. Economy Bank of Ambridge***, 197 A.2d 721 (Pa. 1964), and ***Wujcik v. Yorktowne Dental Assoc., Inc.***, 701 A.2d 581 (Pa. Super. 1999)—demonstrate that "purely amalgamated damages analyses such as that presented by Zito Media are legally insufficient." Deloitte's Brief, 1313 EDA 2016, at 17. Neither decision supports Deloitte's argument. The issue in ***Stevenson*** was

whether a bank was liable for improperly restricting the plaintiff's access to cash in a safe deposit box. Our Supreme Court held that the plaintiff could only obtain nominal damages from the bank. *Stevenson*, 197 A.2d at 727. The Court reasoned that the plaintiff was litigating her entitlement to the cash in another court, and the outcome of that case would render the action against the bank moot; if she was entitled to the cash, she would recover it in the other action, and if she was not, she suffered no harm from the bank's conduct. *Id.* at 726-27. This decision has no relevance to the propriety of Brandon's expert opinion in the present case. In *Wujcik*, the plaintiff, a dentist, agreed to work for a dental practice on condition that he receive thirty-five percent of the fees actually collected by the practice. The plaintiff did not prove what the practice actually collected but simply showed that dentists customarily collect between 90-93% of accounts receivable. This Court held that proof of dentists' "average collection percentage would be little more than pure speculation of the actual amount collected by [the practice] on those accounts generated by [the plaintiff's] work." *Wujcik*, 701 A.2d at 584. In contrast, Brandon identified the range of damages suffered not by the average cable company but specifically by Zito Media.

Deloitte contends that Brandon's opinions are unreliable because he simply accepted financial data provided by Mulcahey, a "disgraced Adelphia insider" who helped Adelphia commit fraud. Deloitte's Brief, 1313 EDA 2016, at 19, 20-21. The Rules of Evidence provide:

- 40 -

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703. Here, Brandon was "made aware of" data that Mulcahey, a financial officer at Adelphia, gathered for him. Deloitte has not demonstrated that this data was inaccurate or fabricated, or that it is unreasonable for a financial expert to rely on this type of data in formulating his damages assessments. The thrust of Deloitte's argument is that the data is unreliable because Mulcahey himself is a fraudster. Deloitte's Brief, 1313 EDA 2016, at 19-22. While Deloitte points to several examples that indicate Mulcahey participated in financial wrongdoing at Adelphia, we cannot see why Mulcahey's conduct automatically invalidates the data that he gathered for Brandon. Mulcahey's credibility, or lack thereof, might be a subject for the factfinder to weigh during trial,[16] but it does not nullify Brandon's opinion as a matter of law.

Finally, Deloitte argues that the deposition testimony of Michael and James Rigas proves that Zito Media suffered no damages. Although these witnesses might not have pinpointed the exact amount of Zito Media's

---

[16] Zito Media argues that findings of fact from a previous SEC action that Deloitte raises as evidence of Mulcahey's fraud are inadmissible in this case under Pa.R.E. 403, 404(a)(1), 607(b) and 608(b)(1). Zito Media's Brief at 1313 EDA 2016, at 9-10. We leave it to the Court of Common Pleas to address these issues, assuming that they arise at all on remand.

damages, Michael Rigas testified that Coudersport TV lost "all value at least" and "all of [its] assets . . ." Zito Media's Reply Brief, 1313 EDA 2016, at 10-11. Thus, Zito Media did not admit that it suffered no damages whatsoever. The amount of damages it suffered is a matter for the factfinder.

For these reasons, we quash all appeals except for Zito Media's appeal at 1313 EDA 2016. In 1313 EDA 2016, we remand for further proceedings in accordance with this memorandum.

Appeals quashed at 1311, 1312, 1314, 1315, 1316, 1317, 1318 and 1319 EDA 2016. Order at 1313 EDA 2016 reversed and remanded for further proceedings in accordance with this memorandum. Applications to quash dismissed as moot. Application for post-submission communication denied as moot. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/27/2017

- 42 -